929 A.2d 74

**Betty Brown CASEY, Trustee**

v.

**MAYOR AND CITY COUNCIL OF ROCKVILLE.**

**No. 85, Sept. Term, 2006.**

Court of Appeals of Maryland.

July 30, 2007.

Barbara A. Sears (John J. Delaney, Erin E. Girard, and Justin P. Hayes of Linowes and Blocher L.L.P., on brief), Bethesda, MD, for Petitioner.

Sondra Harans Block (Paul T. Glasgow, on brief), Rockville, MD, for Respondent.

Argued before BELL, C.J., and RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and ALAN M. WILNER, (Retired, specially assigned), JJ.

HARRELL, J.

This case invites examination of a decision of Respondent, the Mayor and Council of Rockville, Maryland, to designate as historically/architecturally significant and, as a result, place within Rockville's historical district, a certain piece of improved real property. The property at issue is an 11,300 square foot parcel of land located at 115 Park Avenue, at the intersection of Fleet Street and Park Avenue, and improved with a 1½ story bungalow (collectively the "Property") constructed approximately 80 years ago by one Henry Howes for J. Roger Spates and his wife, Annie E. Spates. The bungalow, now owned by the Betty Brown Casey Trust,[1] is commonly referred to in Rockville as the "Spates Bungalow."

Because the historic designation of the Property may hinder substantially Petitioner's ability to raze the bungalow in order to put the land to arguably a more economically rewarding use,[2] the Trust filed a petition in the Circuit Court for Montgomery County seeking judicial review of the historic

---

1. The Petitioner in this case is Betty Brown Casey, acting in her capacity as Trustee.

2. Due to urban renewal of downtown Rockville occurring in the early 1970's and the Property's close proximity to major roads, government buildings, and other office buildings, 115 Park Avenue is well-positioned for redevelopment.

designation action. The Circuit Court, on 15 October 2004, opined that the decision to place the Property in the historic district was not arbitrary on the record before it, but nevertheless remanded the matter to the Mayor and Council in order to consider the economic feasibility of preserving the bungalow. According to the Circuit Court, the Mayor and Council erred in neglecting to consider this factor in the course of its deliberations on whether to designate the Property as historic. Upon appeal by the Mayor and Council, the Court of Special Appeals, although agreeing with the Circuit Court's conclusion as to the sufficiency of evidence supporting the Mayor and Council's decision concerning historical significance, reversed the Circuit Court's judgment remanding the matter. The intermediate appellate court reasoned that the Mayor and Council was not required to consider economic infeasibility of preservation when deciding whether to include the Property within the historic district. For the reasons that follow, we affirm the judgment of the intermediate appellate court.

## FACTUAL BACKGROUND

Since the date it was platted, the land upon which the Spates Bungalow is located has been linked for most of the time to arguably significant figures in Rockville history. Prior to construction of the bungalow, the land was part of a larger tract ("The Park") [3] owned by Judge William Veirs Bouic, Sr., a prominent political leader during a period of rapid growth in Rockville in the mid- to late–19th century. Considered instrumental in securing self-governance for Rockville in 1860, Judge Bouic served as a Town Commissioner until 1867. Previously the State's Attorney for Montgomery County and counsel to the B & O Railroad, he was appointed to the Circuit Court for Montgomery County in 1867, and served in that capacity until 1882. By the end of Judge Bouic's judicial career, his only son, William Veirs Bouic, Jr., also a resident of

---

3. "The Park" was platted originally in 1888, and consisted of a subdivision of 25 lots located immediately adjacent to the Agricultural Society Fair Grounds in Rockville.

"The Park," [4] had himself become a prominent civic leader. Bouic, Jr., educated at the Rockville Academy and Columbian University in Washington, D.C., was admitted to the Bar of Maryland in 1870. During his illustrious career, Bouic, Jr., was Rockville's first Mayor under the Town Charter of 1888, elected to the State Senate in 1897, a presidential elector, and helped form the Maryland State Bar Association. MARYLAND STATE ARCHIVES, 110 MARYLAND MANUAL 178–79 (1898).

Despite the land's historical roots prior to construction of the bungalow, it is the bungalow itself that was the main focus of the current historic designation controversy. After the death of Bouic, Jr., his estate sold to Mr. and Mrs. J. Roger Spates two subdivided lots located within "The Park." Constructed for the Spates family approximately in 1923, the bungalow is believed to have been the Spates family's primary residence during Roger's term as Rockville's Mayor from 1926 to 1932.[5] The Spates Bungalow is one of the last two original structures remaining in what had been "The Park" subdivision. It is considered by some to be "an excellent and little-altered example of the Craftsman style of architecture" popular in the 1890's to 1920's.[6] J. Roger and Annie E. Spates sold

---

4. Bouic, Jr., constructed a home commonly referred to as "Boucilla" on a sizeable lot located west of Park Avenue.

5. This fact was disputed at the relevant administrative proceedings. Even though Petitioner argued that "no evidence was presented ... that Mr. Spates actually even lived in" the Spates Bungalow, as the intermediate appellate court noted, Petitioner's architectural history and preservation expert, Daniel Koski–Karell, Ph.D., posited that Spates resided at 115 Park Avenue during his term as Mayor. Dr. Koski–Karell, in his research regarding the Property, discovered that the electrical panel within the house bears a 1929 time-stamp. This lead him to believe that the house actually was constructed in 1929. Pinpointing the exact year of construction, however, is not material to the disposition of the issues before this Court because it was the architectural style of the house that was responsible principally for the bungalow being designated as historic. Moreover, at this juncture, the sufficiency of the evidence supporting the historic significance of the Property is not at issue.

6. This fact likewise was in dispute. While experts for Respondent posited that the residential structure's unique Craftsman style gave the

the Property on 5 December 1949 to Bernard and Catherine J. Poss who, in turn, sold the Property in 1954 to Mary E. Clements Offutt. Mrs. Offutt was the widow of Lee Offutt, the Mayor of Rockville from 1906–1916 and again from 1918–1920. After Mrs. Offutt's death in 1963, the executors of her estate sold the Property to Eugene B. Casey who, in 1990, along with his wife, Betty Brown Casey, as trustees, transferred the Property to the Betty Brown Casey Trust ("Trust"). The Trust remains the current owner.

From 1980 until 1999, the Property was leased to a Montgomery County surveyor who used the bungalow primarily for

---

house its historical significance, Dr. Koski–Karell was of the opinion that "[t]he dwelling at 115 Park is a derivation from a Sears House Bungalow design, which is itself a derivation from the Craftsman Style. The stylistic linkage between 115 Park and the Craftsman architectural style is twice-removed and may be fairly characterized as attenuated and tenuous." According to the Maryland Historical Trust forms completed by the State Highway Administration ("SHA") regarding 115 Park Avenue, the Craftsman style was the dominant style for many modestly-sized homes during the time period between 1905 and the mid–1920's. Originating in southern California in the early 20th century, Craftsman bungalows were "characterized by low pitched, gabled roofs with wide overhangs; exposed roof rafters; decorative beams and braced under the gables; and porches supported by tapered square columns that extend to ground level." According to the record, experts that submitted testimony in favor of designating the Property as historic believed that the Spates Bungalow's "wide eave overhangs, triangular knee braces at the gables, an inset porch with tapered square columns resting on solid square piers that extend to the ground, and a gabled dormer" were indicative of various decorative features common to the Craftsman style.

We reiterate, however, that this background information on the Property is included here merely to illustrate the character of the record before us. The Court of Special Appeals determined, as we will discuss *infra*, that Respondent's decision regarding the historical significance of the Spates Bungalow was reached in a quasi-judicial proceeding supported by substantial evidence. The sufficiency of the evidence supporting that conclusion is not at issue here. Rather, the challenge here is based on the theory that Respondents failed to consider an additional factor, the economic infeasibility of preserving the Property, in determining whether to place the Property within the historic district zone. Subjecting redevelopment of the Property (and particularly the bungalow) to a host of additional governmental protections and considerations not pertaining to property not so designated is a consequence of Respondent's action.

the purposes of storage and some office space.[7] When the surveyor, due to the bungalow's deteriorating condition, declined to renew his lease and vacated the premises in 1999, a structural engineer was engaged to evaluate the Property. The engineer determined that rehabilitation of the bungalow would not be cost effective, and concluded that demolition of the building was appropriate. Specifically, the engineer's report indicated that the bungalow was unusable for commercial leasing due to its extensive disrepair. The record indicates that Petitioner's consultants estimated the costs of restoration of the house at approximately $293,086.20, that the assessed value of the restored Property would be $318,000, and that the amount expended to achieve such a result could not be recouped easily through rental income derived from lease of the Property. This evidence regarding the economic feasibility of restoration, based on our perusal of the record, has not been met yet with contrary evidence.[8]

---

7. The Property, prior to its historic designation, was located in an "O–1 Office Building" zone. "The purpose of the O–1 Zone is to provide office space for private, quasi-public and public uses and complementary service uses and to provide a transition between general commercial and residential uses." Rockville City Code § 25–272(i). Land located within an O–1 Zone permissibly may be used for the purposes of multi-family residential units; certain institutional uses such as education, child care, churches and other places of worship; commercial office space; industrial uses; medical and dental services; and retail and commercial services. For a complete list of the permissible uses of land within the various zones established in Rockville, see the "Table of Uses" codified in Rockville City Code § 25–296. Multi-family dwellings units may be constructed subject to a maximum density of sixty units per acre, "except that the Planning Commission may approve the development of up to one hundred (100) units per acre in accordance with the optional method procedures . . ." as set forth in Rockville City Code § 25–326(b)–(d). Rockville City Code § 25–326(a). Other special development standards for residential uses exist throughout the code. *See, e.g.,* Rockville City Code § 25–328 (providing for reduction of the minimum lot area per dwelling unit pursuant to the Moderately Priced Housing Ordinance). While retail and commercial services uses are permitted in the O–1 zone, the services may not occupy more than 25% of the gross square footage of the structure, and "shall not be visible from any public right-of-way except a major highway." Rockville City Code § 25–318.

8. As we will describe *infra,* however, it does not appear that Respondent had any meaningful reasons for adducing contrary evidence, if

In light of this financial picture, the Trust began the building demolition process in June 2001 by obtaining a preliminary forestry sign-off regarding the preservation of trees on the Property. A formal demolition permit application was filed with the Rockville Planning Department on 7 September 2001. The application was accepted and entered into the permit computer system on 17 September 2001. At the time of filing of the application, the Property was not designated as being within a municipal historic district.[9] Sometime in September of 2001, Petitioner contends a representative of the City staff informed it that all requirements for issuance of a demolition permit had been satisfied and that a permit would be issued shortly.[10]

such existed, at this point. The City, from the onset of the historic designation process, was of the opinion that economic feasibility would not play a role in the present controversy until, if at all, the Property was designated as historic and consideration of the permit application to raze the bungalow pursued to a conclusion. Subsequent indications to this Court, as well as the courts below, suggest that Respondent would take issue with the methodology used in arriving at Petitioner's cost estimates, namely the failure of those estimates to take into consideration the application of Rockville's "smart codes" that might reduce appreciably the cost of restoration.

9. The record indicates that the Property was identified as a "historical resource" as early as 1986. Nonetheless, it had not been designated formally as a historic site.

10. The record is unclear exactly who informed Petitioner that the permit was ready to be issued. Wanda Shiers, a representative of the Trust who was responsible for filing the demolition permit application and pursuing the permit's issuance, posited at the 17 June 2002 hearing before Respondent that she began meeting with City staff in July 2001 regarding the Trust's desire to raze the bungalow, and was given a checklist of agencies and public utilities that had to sign off on the project before the demolition permit application could be filed formally. Petitioner's counsel declaimed at the 16 October 2001 Historic District Commission meeting that, after the proper utilities signed off on the project and the permit application was filed, an unnamed individual from the City Planning Department informed Ms. Shiers and Casey Management, another representative of the Trust, that no plans were necessary because it was only a demolition permit application and that the permit would issue after the Forestry Department reviewed the Property. Ms. Shiers's recollection of the correspondence between

On 2 October 2001, however, Petitioner was informed by letter that the permit application remained pending, subject to review of the Property by the Rockville Historic District Commission ("HDC") [11] regarding the historical/architectural significance of the bungalow. According to that letter, Peerless Rockville Historic Preservation, Ltd. ("Peerless Rockville"), a third-party, non-profit historic preservation group, nominated the Property for historic designation due to its link to prominent historical figures in the local government, as well as its architectural appeal. The Mayor and Council of Rockville requested, as a result, that the HDC evaluate the Property and make a recommendation regarding its eligibility for historic designation.[12] The letter continued that "the City of Rockville's Environmental Guidelines recommend that buildings over 50 years old be evaluated for historic significance to the City in the event of a demolition permit application." The HDC open meeting was scheduled for 16 October 2001, at which time the HDC would hear testimony from all interested

representatives of the Trust and the City is consistent with Counsel for Petitioner's statements.

11. The Rockville Historic District Commission ("HDC") is a five-member entity created by Rockville City Code § 25–71 under the authority of Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 8.03(a). The primary functions of the HDC are to review permit applications for sites located within the historic district commission, Rockville City Code §§ 25–237, 25–238, as well as to assist the City in identifying sites for cultural and historical designation. CITY OF ROCKVILLE, ENVIRONMENTAL GUIDELINES FOR THE PROTECTION AND ENHANCEMENT OF THE CITY'S NATURAL RESOURCES 24–25 (adopted by Mayor and Council of the City of Rockville, July 1999).

12. The stated purpose of the Maryland Historic Area Zoning Act is "to preserve sites, structures, and districts of historical, archeological, or architectural significance and their appurtenances and environmental settings." Md.Code (1957, 2003 Repl.Vol.), Article 66B, § 8.01(b)(1). It is under this Act that Respondents, the Mayor and City Council of Rockville, are delegated the authority to designate zoning boundaries for the purposes of identifying as historic specific pieces of property. Article 66B, § 8.02 ("[E]ach local jurisdiction may designate boundaries for sites, structures, or districts which are deemed to be of historic, archeological, or architectural significance, by following the procedures of the local jurisdiction for establishing or changing areas and classifications of zoning.").

parties.[13] In the event that the HDC made a recommendation in favor of designation, the matter would be transmitted to Respondent for further action.

At the 16 October 2001 meeting, the parties, in addition to representatives of Peerless Rockville, were given the opportunity to present testimony and other evidence. The record indicates that, at this meeting, Counsel for Petitioner submitted evidence, premised on an assessment completed by the property manager of Casey Management, that renovating the Property to the point that it could again be leased for storage would require extensive repair. Counsel for Petitioner requested at the conclusion of the meeting that the record remain open for three weeks in order to allow for submission of additional information so that the HDC would be apprised fully of the situation before making its recommendation. Counsel's request was granted, and the parties were allowed to submit additional information, including various reports by their respective experts regarding the historical and architectural significance of the Property, as well cost estimates for its restoration. It was during this time that the Trust submitted further evidence suggesting that it would not be financially feasible to restore the bungalow on the Property if it were placed in the historic district zone. After further consideration, the HDC reached a unanimous decision that the Property be designated as a single-site historic district and forwarded its formal recommendation to that effect to Respondent on 18 December 2001. The HDC, in rendering its formal recommendation that the property be designated as historically/architecturally significant, acknowledged briefly evidence of the bungalow's disrepair. The HDC nevertheless found that "[t]he Spates Bungalow at 115 Park Avenue me [t] seven of the twelve criteria for eligibility as a single site historic district or landmark site" and forwarded the matter to the Mayor and Council. The HDC, in doing so, observed that Petitioner's takings and economic feasibility contentions were

---

13. Public notice of the hearing was sent by mail on 9 October 2001 to all surrounding property owners and interested persons.

"beyond the scope of [the HDC's] evaluation [at this point in the proceedings]."

A meeting was held on 28 January 2002 during which Respondent considered the HDC's recommendation for historic designation. Respondent, at that time, authorized HDC staff to prepare, over the objection of Petitioner, an application for a proposed map amendment to include 115 Park Avenue within Rockville's historic district. A Historic District Sectional Map Amendment Application was filed on 12 February 2002.[14] The matter was referred to the Rockville Planning Commission.[15] A hearing date before the Mayor and Council was set.[16] The Planning Commission held its hearing on 8 May 2002 in order to consider the proposed map amendment and recommended against re-zoning the Property from O–1 to O–1 HD (Historic District).[17]

---

14. Section 25–117 of the Rockville City Code requires that an application for a sectional or comprehensive map amendment (as opposed to a local zoning map amendment) be submitted only by the Planning Commission or by the Council.

15. The Planning Commission is charged, *inter alia,* with the task of reviewing and making recommendations to the Mayor and Council regarding all applications for map and text amendments filed with the City Clerk. According to § 25–124 of the Rockville City Code, a copy of any map amendment application shall be sent to the Planning Commission. The Commission may submit a recommendation for review by the Mayor and Council.

16. Pursuant to § 25–123 of the Rockville Code, "[u]pon acceptance for filing of any [map amendment] application ..., the City Clerk shall set the application for a hearing by the Council at a specified date, time and place, and cause public notice thereof to be given in accordance with the requirements of State law." Under the City Code, "[n]o application [for a zoning amendment] ... may be granted unless a public hearing shall have been held thereto in accordance with the requirements of State law," at which all parties in interest and citizens have an opportunity to be heard. Rockville City Code § 25–93.

17. The historic designation "act[s] as an overlay for a specific parcel or assemblage of properties, [and] is placed on top of the underlying zone or zones, in the present case a Euclidian zone." *Maryland Overpak Corp. v. Mayor & City Council of Baltimore,* 395 Md. 16, 28, 909 A.2d 235, 242 (2006). The underlying zone, the O–1 zone in this case,

The Mayor and Council held its hearing on 17 June 2002 to determine whether the Property should be placed in the Historic District Zone. Petitioner again objected to the designation and presented additional testimony that the costs of restoring the Spates Bungalow outweighed the added value of the bungalow to such a degree that the difference could not be recouped through rental income derived from the revitalized Property.[18]

Respondent held another public meeting on 12 May 2003 and voted to leave open the record through 30 May 2003 for the parties to submit additional information. Respondent directed HDC staff on 27 May 2003 to prepare a proposed Ordinance to Grant Map Amendment Application establishing the single-site historic district encompassing 115 Park Avenue. It was the Mayor and Council's announced intent that the ordinance be introduced at its General Session meeting to be held on 9 June 2003.[19] The ordinance in fact was introduced on 9 June 2003. It was adopted unanimously by the Mayor and Council on 14 July 2003. Pertinent prefatory parts of Ordinance No. 19–03, in addition to placing emphasis on the relative historic prominence of the previous owners of the land on which the bungalow is located, recited the following procedural and explanatory reasons for adoption:

---

remains on the official Zoning Map for the City of Rockville, subject to the additional regulations consequential to the historic designation. *Id.*

18. McShea & Company, Inc., a commercial real estate company, opined that the maximum feasible $12 per square foot monthly rent derived from the restored building would be insufficient to recoup the extensive costs of renovation.

19. A General Session is an open meeting conducted by Respondent to which all residents are invited to attend. The ultimate goal of such a meeting is to invite citizen participation in the decision-making process and to open lines of communication between the citizens and the municipal government by allowing citizens to present their issues directly to the Mayor and Council. Rockville City Government, *Frequently Asked Questions: Council–Manager Form of Government, at* http://www.rockvillemd.gov/FAQ/formofgov.htm (last visited 25 April 2007).

274

WHEREAS, the subject property was evaluated for historic, architectural and cultural significance to the City of Rockville, and the Historic District Commission found that the property met the criteria for local historic designation and recommended its placement in the Historic District; and

WHEREAS, the Mayor and Council gave notice that a public hearing on said application would be held by the Mayor and Council of Rockville in the Council Chambers in Rockville on the 17th day of June, 2002, at 7:30 p.m., or as soon thereafter as it may be heard, at which parties in interest and citizens would have an opportunity to be heard, which notice was published in accordance with the requirements of Article 66B of the Annotated Code of Maryland; and

WHEREAS, on the 17th day of June, 2002, the said application came on for hearing at the time and place provided for in said advertisement; and

\* \* \* \* \* \*

WHEREAS, ... The house known as the "Spates Bungalow" was built in 1923 and is in near original condition. The house has the hallmarks of the vernacular craftsman-inspired style of architecture: wide eaves with knee brackets, clapboard siding, exposed rater tails on the porch and dormer roofs, multi-paned windows used singly, paired and in strings of three, smaller casement windows flanking the fireplace, and a rusticated concrete block foundation where exposed. The front porch, with a stepped lintel beam framing the porch opening, the short tapered square wooden columns on brick piers, and the flanged trim with suggestions of horizontal supports separating the beam from the clapboard, contains most elements of popular craftsman style. The house embodies a distinctive character of a different time and place, and serves as a historical reminder of an early subdivision that has all but disappeared. It is one of only two structures left of "The Park."

\* \* \* \* \* \*

The house is a representative bungalow built in the 1920's for a Mayor of Rockville. This house form became a national expression of craftsmanship, healthful and functional living and simple beauty that harmonized with suburban, urban or rural surroundings. Mr. Spates had his bungalow built by a local builder in the style of the day in his small town. . . .

Absent from the ordinance establishing the historic district was any apparent consideration of the financial feasibility of preserving the bungalow. As a result of the designation, the Property became subject to the requirements of §§ 8.01–8.17 of Article 66B of the Maryland Code, which restricts substantially Petitioner's ability to alter, develop, or, as in the present case, demolish the bungalow.

Petitioner filed on 7 August 2003, pursuant to § 25–100 of the Rockville City Code,[20] a Petition for Judicial Review in the Circuit Court for Montgomery County. The Circuit Court issued on 15 October 2004 its memorandum opinion. The court ruled first that "[t]he [re-zoning] or altering the zoning of property is a valid legislative exercise of the police power by the Mayor and City Council" and determined, as a result, that the Mayor and City Council's decision would be upheld if based upon "substantial" or "fairly debatable" evidence. The Circuit Court concluded summarily that the finding of historical significance was neither arbitrary nor capricious, and affirmed the findings of the Mayor and Council in that respect. In the second portion of its opinion, however, the court found legal error in "the failure of the Mayor and City Council to consider [in determining whether to designate the Property within the historic district zone] the unrefuted evidence submitted by Petitioner[ ] which established that it is not econom-

---

**20.** Section 25–100 of the Rockville City Code provides that "[a]ny person aggrieved by a decision of the Council on any application for an amendment to the zoning map or by any decision by the Council adopting or amending the [Master] Plan may appeal such decision to the Circuit Court for the County in accordance with the Maryland Rules. . . . "

ically feasible to renovate the building . . . ." The court therefore remanded the matter to the Mayor and City Council for consideration of that evidence.

Petitioner noted a timely appeal to the Court of Special Appeals. Respondent noted a cross-appeal on 19 November 2004. Petitioner took issue with the Circuit Court's conclusion that the findings of architectural and historical significance were supported by substantial evidence. Respondent challenged the decision to remand to consider the economic infeasibility of renovation. The intermediate appellate court considered the following questions in the appeal and cross-appeal:

1. When the Mayor and Council re-zoned the subject property to the 0–1HD . . . zone was it exercising its "quasi-judicial" fact-finding function or a legislative function?

2. Was the Mayor and Council's decision to re-zone the Trust's property to the 0–1HD zone supported by substantial evidence?

3. Did the circuit court err when it remanded the case so that the Mayor and Council could consider the economic feasibility, vel non, of renovation of the Spates Bungalow?

The Court of Special Appeals filed its unreported opinion on 9 August 2006. The intermediate appellate court determined first that the Mayor and Council, when it designated the Property as within the historic district, did so as the result of a quasi-judicial process. The reasoning behind this conclusion was that, because the matter concerned the re-zoning of an individual lot, and because the Mayor and Council permitted all parties to introduce evidence in a judicial-like hearing, the action taken by Respondent fell within the "piecemeal" category of zoning actions traditionally reached after a quasi-judicial process. The next step in the Court of Special Appeals's analysis, therefore, was to determine whether the Council's decision to re-zone the Property was supported by "substantial evidence." The court determined that it was supported by such evidence, thus agreeing with the Circuit Court's conclusion in that regard. The court explained that, although the architectural and historical significance of the Property was at

least debatable, a rational fact-finder in the Mayor and Council's position reasonably could conclude on the evidence before it that the Property was worthy of designation. The evidentiary sufficiency for this conclusion is not challenged before this Court.

The Court of Special Appeals's opinion as to the third issue, however, bears the brunt of a substantial portion of the challenges by Petitioner before us. The intermediate court concluded that "the only issues essential to the council's determination of whether a structure 'should' be preserved is the historic, archaeological, or architectural significance of the structure." "Financial hardship and economic feasibility," according to the court, "are reserved for the determination by the local historic district commission who is explicitly empowered to decide whether demolition or alteration of the structure should be allowed despite such significance." The intermediate court therefore reversed the judgment of the Circuit Court an d restored to its original force the action of the Mayor and City Council.

The Trust filed timely with us a Petition for Writ of Certiorari to review the judgment of the Court of Special Appeals. We granted the petition on 6 December 2006, 396 Md. 9, 912 A.2d 646 (2006), and shall consider the following questions: [21]

---

21. The questions framed in this opinion are reworded from their original form in the Petition in order to express our understanding of the issues actually before us. The questions presented in the Petition for Writ of Certiorari were:

1. Whether Article 66B § 8.01 et seq., of the Maryland Annotated Code precludes the Rockville Mayor and Council from considering economic feasibility and financial hardship when reviewing properties for historic designation and whether such an analysis is appropriate where the trigger for the review is a demolition permit application?

2. Whether the process followed by the City of Rockville in withholding Petitioners' demolition permit, pending historic review of the Property by the [HDC] and consideration of the map amendment to place the property in the historic district by the Mayor and Council, violated Petitioners' procedural due process rights?

1. Whether the Mayor and City Council of Rockville were required to consider, when determining whether to designate as historic a particular piece of property pursuant to Maryland Code (1957, 2003 Repl.Vol.), Article 66B, §§ 8.01–8.17, the economic feasibility associated with preserving that property if so designated and, if required, whether the failure to do so constituted a regulatory taking of the Property without just compensation? [22]

2. Where the trigger for review of historical significance is a demolition permit application, and the subject property is not designated as historic prior to the filing of such an application, but has been on the municipality's list of historic resources since 1986, does the withholding of issuance or final action on the permit application, pending review of the Property by the Historic District Commission and the Mayor and Council, deprive the applicant of a constitutionally protected property interest without due process of law? [23]

We answer both questions in the negative and therefore affirm the judgment of the Court of Special Appeals.

---

**22.** Petitioner's brief, to our reading, is somewhat unclear in this regard. Petitioner's brief is divided into two portions. The first addresses whether the initial withholding of the permit, pending review by the HDC and Respondent of historical significance, violated Petitioner's right to procedural due process. The second major heading addresses whether the Mayor and Council was required to consider financial hardship and economic feasibility when reviewing the Properties for historic designation. Although the portions of the brief pertaining primarily to economic feasibility do not refer in so many words to a regulatory takings thesis (Petitioner tackles that issue in the former section of its brief), Petitioner makes specific allusion to impairment of the economic viability of the Property as a result of historic designation.

**23.** As already indicated, the somewhat circular nature of the reasoning in Petitioner's brief sheds little light on the substance of its argument beyond the "obvious shortcomings" alleged by Petitioner with regard to the action of the Mayor and Council and the analyses of the Circuit Court and Court of Special Appeals.

## DISCUSSION

### A. Regulatory Takings and Consideration of the Economic Feasibility Associated With Identifying and Preserving Historically Designated Property

*1. The Mayor and Council are Not Required to Consider Economic Feasibility at the Time of Historical Designation.*

Petitioner argues first that "[Article 66B, §§ 8.05–8.10, (the statutory scheme governing historic district development permits)] do[es] not ... address situations such as the instant one, where a property owner, not located in an historical district and upon whose property no historic designation restrictions then apply, files a demolition permit application ... and is then informed that the permit will be then withheld until the property is evaluated for historical significance. In such cases, [according to Petitioner,] the issue of the underlying permit to demolish the structure must not be ignored in the designation process before the local legislature, and evidence relevant to the issue of demolition, such as economic feasibility and financial hardship, must not be precluded from consideration as was done in this case." Before approaching the merits of this argument, we pause to examine the procedures by which a property, under normal circumstances, may be designated as worthy of historic significance for land use purposes, as well as the consequences of historic designation as it relates to the procedures an applicant must follow in obtaining a permit for construction, alteration, or demolition of improvements or structures on the property.

■ It is well-settled that the adoption and administration of zoning procedures are an exercise of police power delegated to specific individual political subdivisions and municipalities of the State. *Maryland Overpak Corp. v. Mayor & City Council of Baltimore,* 395 Md. 16, 26, 909 A.2d 235, 241 (2006) (citing *Superior Outdoor Signs, Inc. v. Eller Media Co.,* 150 Md.App. 479, 494, 822 A.2d 478, 487 (2003); *Mayor & Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 542, 814 A.2d 469, 486 (2002)). As we stated in *Rylyns,*

[t]racing the entire panoply of related enabling statutes in Maryland is a tad complex. The provisions empowering municipal corporations in Maryland are contained in Maryland Code (1957, 1998 Repl.Vol.), Article 23A, and with regard to home rule powers specifically, Art. 23A, § 9. Similar provisions detailing the powers for non-charter counties are found in Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 25. Further complicating the matter, the authority of the counties of Montgomery and Prince George's are controlled by Maryland Code (1957, 1998 Repl. Vol., 2002 Supp.), Article 28. The land use provisions of Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B pertain primarily to Art. 23A municipalities and Art. 25 non-charter counties, although certain provisions apply to Maryland Code (1957, 1998 Repl.Vol.), Art. 25A charter counties, as well as to Montgomery and Prince George's Counties, Art. 66B, §§ 1.02 and 7.03, and also to the City of Baltimore, Art. 66B, §§ 2.01–2.13 and 14.02.

*Rylyns*, 372 Md. at 528, 814 A.2d at 476–77. Thus, empowered political subdivisions may adopt zoning procedures for designating as historic an area or a particular parcel of property. *See, e.g.*, Article 66B, § 8.02 ("For the purposes of this subtitle,[24] each local jurisdiction may designate boundaries for sites, structures, or districts which are deemed to be of historic, archaeological, or architectural significance, by following the procedures of the local jurisdiction for establishing or

---

**24.** The stated purpose of any ordinance or resolution, adopted pursuant to the authority delegated by Article 66B, establishing a historic district or otherwise amending an existing district to include a certain piece of property is to:

(1) Safeguard the heritage of the local jurisdiction by preserving sites, structures, or districts which reflect elements of cultural, social, economic, political, archeological, or architectural history; (2) Stabilize and improve the property values of those sites, structures, or districts; (3) Foster civic beauty; (4) Strengthen the local economy; and Promote the preservation and appreciation of those sites, structures, and districts for the education and welfare of the residents of each local jurisdiction."

Article 66B, § 8.01(c).

changing areas and classifications of zoning."). The City of Rockville exercised its grant.

The historic designation process in Rockville ordinarily begins with the nomination of a property for historic designation. Although nomination originates, in most cases, with the property owner or an interested governmental authority, such as the Historic District Commission, sometimes a property is nominated by a third party, e.g., Peerless Rockville. According to the City of Rockville's "Historic District Eligibility Information" website, furthermore, it is the HDC's policy that "[a] structure that is the subject of a demolition application and is at least 50 years of age is automatically reviewed by Historic Preservation Office staff and the Historic District Commission (HDC) for significance to the City under the Environmental Guidelines." City of Rockville, *Historic District Eligibility Information*, at http://www.rockvillemd.gov/historic/hd-criteria.html (last visited 11 May 2007). The Property (including the more–than–50–year–old Spates Bungalow) in the present case, in addition to being nominated by Peerless Rockville, was the subject of a demolition permit application.

After receipt by the City of a nomination or the filing of a demolition permit application for an apt property, HDC staff evaluates the property in order to determine if it is eligible for designation. City of Rockville, *Historic District Eligibility Information*, at http://www.rockvillemd.gov/historic/flowchart.html (last visited 11 May 2007). This process, at a minimum, involves a review of the Historic Buildings Inventory maintained by the City, as well as any Maryland Historic Trust documentation that may exist regarding the property. *Id.* An evaluation meeting is scheduled for the next HDC meeting following completion of the review, which meetings occur every third Thursday of the month, with notice sent to the commissioners, the property owner, and all neighbors within a quarter-mile radius of the property. *Id.* If the nomination is uncontested, the HDC makes a recommendation pertaining to eligibility for historic designation. *Id.* This recommendation is transmitted for the Mayor and Council's review. If the nomination *is* contested, however, the HDC holds the record open

for submission of additional evidence and the evaluative decision carries over until another HDC meeting. After the subsequent meeting, the HDC provides a written report to the Mayor and Council. *Id.*[25]

In the event the HDC evaluation favors designation, the process continues with an application to amend the existing zoning map. A proposed amendment to the City's zoning map may take one of three forms: (1) a local amendment pertaining to a single parcel of land; (2) a sectional amendment covering a certain portion of the City; or (3) a comprehensive amendment, which covers the entire City. Rockville City Code § 25–116. In the event of a local amendment, the application may be initiated by any municipal agency or any person with a financial or proprietary interest in the ·property. Rockville City Code § 25–117. If the proposed amendment is either sectional or comprehensive, the application may be filed only by the City Planning Commission or the Mayor and Council. *Id.* The City Clerk, upon acceptance of the application, transmits a copy to the Planning Commission. The Commission then completes an independent analysis of the property and submits to the Mayor and Council a recommendation as to whether it should be designated as historic. This document is included in the record and is considered by the Mayor and Council in reaching its final decision concerning the application. Rockville City Code § 25–124.

Approval by the Mayor and Council is required before any map amendment application may be granted. Action must be preceded by notice and a public hearing before the Mayor and Council, where all interested persons or entities have an opportunity to present their respective positions on the matter. Rockville City Code § 25–93.[26] At the public hearing,

---

**25.** In the present case, the HDC evaluated the Property at the 16 October 2001 HDC meeting, kept the record open at the request of Petitioner, and rendered on 18 December 2001 its final written recommendation to the Mayor and Council that the Property was eligible for designation.

**26.** Upon filing of an application with the City Clerk, the City Clerk sets the application for hearing with the Mayor and Council. Rockville City

"[t]here shall be a complete stenographic report of the testimony at the hearing, and a typewritten transcript thereof with all exhibits admitted at the hearing, together with the application, all staff and Planning Commission memoranda and recommendations in relation thereto and a list of those persons registering their appearance, shall promptly be incorporated by the Clerk in the application file and shall be considered a part of the record on the application." Rockville City Code § 25–93(b)(3). Within 90 days of the date of the last hearing, unless the Mayor and Council adopts a resolution stating otherwise, Rockville City Code § 25–125, the Council "shall provide written notice of its decision on any application by first class mail to the applicant, the Planning Commission, and to any other person who has registered an appearance in writing prior to decision by the Council." Rockville City Code § 25–95.

The only legislatively-declared criteria for designation of a property as historic is set forth in Article 66B, § 8.02, which states that "[f]or the purposes of this subtitle, each local jurisdiction may designate boundaries for sites, structures, or districts which are deemed to be of *historic, archaeological, or architectural significance* . . . ." What exactly constitutes "historical . . . or architectural significance" is not elucidated by the statute, but we glean from the record made before the HDC, Planning Commission, and the Mayor and Council in the present case that these governmental entities typically consider twelve characteristics of a property in reaching a decision concerning designation.[27] As to historical and cultural significance, the City considers whether a property:

_____

Code, § 25–123. Written notice of the hearing must be sent at least 15 days before the date of hearing to the owners of the target property as well as to all owners either within the area of or immediately adjacent to the property, depending on the type of amendment proposed. Rockville City Code, § 25–122.

**27.** The HDC's recommendation, for example, alluded to the fact that the Property satisfied seven of the twelve criteria for eligibility for historic designation. Ordinance No. 19–03 granting the map amendment application, furthermore, stated that "WHEREAS, the subject

(1) Has character, interest, or value as part of the development, heritage or cultural characteristics of the City; (2) Has character, interest, or value as part of the development, heritage or cultural characteristics of the County; (3) Has character, interest, or value as part of the development, heritage or cultural characteristics of the State; (4) Has character, interest, or value as part of the development, heritage or cultural characteristics of the Nation; (5) Is the site of a significant historic event; (6) Is identified with a person or a group of persons who influenced society; or (7) Exemplifies the cultural, economic, social, political or historic heritage of the Country and its communities.

As to architectural and design significance, the City looks to whether a property:

(1) Embodies the distinctive characteristics of a type, period or method of construction; (2) Represents the work of a master; (3) Possesses high artistic values; (4) Represents a significant and distinguishable entity whose components may lack individual distinction; or (5) Represents an established or familiar visual feature of the neighborhood, community or county due to its singular physical characteristic or landscape.

City of Rockville, *Historic District Designation Criteria Checklist* (1999), *at* http://www.rockvillemd.gov/historic/HD-criteria.pdf (last visited 11 May 2007); *see also* City of Rockville, *Historic District Eligibility Information, at* http://www.rockvillemd.gov/historic/hd-criteria.html. The economic feasibility of renovation is nowhere indicated as a required consideration for the threshold determination whether a site is worthy of historic designation. If the Mayor and Council

property was evaluated for historic, architectural and cultural significance to the City of Rockville, and the Historic District Commission found that the *property met the criteria for local historic designation* and recommended its placement in the Historic District ...." (emphasis added). The ordinance included the following language: "The house embodies a distinctive character of a different time and place, and serves as a historical reminder of early subdivision that has all but disappeared." This language follows closely the language used in the checklist recounted above.

concludes that a property is historically significant, it passes an ordinance granting the zoning amendment application. The resultant historic designation acts as an overlay zoning of the property, and is placed on the top of the existing zone.

A decision to place a parcel of property within a historic district impacts directly the degree of latitude the property owner possesses in deciding how best to utilize his, her, or its land and improvements. The property becomes subject to Maryland Code (1957, 2003 Repl.Vol.), Article 66B, §§ 8.05–8.10. Pursuant to that regulatory scheme, "[b]efore a person may construct, alter, reconstruct, move, or demolish a site or structure located within [the] designated district of [the] local jurisdiction, . . . the person shall file an application with the historic district commission or historic preservation commission." Article 66B, § 8.05(a); *see also* Rockville City Code § 25–237 ("Applications for Historic District permits shall be submitted to the Historic District Commission. Each application shall be submitted on forms provided therefore by the Historic District Commission. . . ."); Rockville City Code § 25–238 ("All applications for Historic District permits shall be considered and acted upon by the Historic District Commission in accordance with the provisions of State law applicable to such permits [(Article 66B, §§ 8.05–8.17)]."). When the HDC receives an application for a demolition permit, for example, it will consider and either approve or reject the application, Article 66B, § 8.05(b), pursuant to a set of "guidelines" enumerated in § 8.06.

The permissible considerations are aimed at the external features of the property,[28] Article 66B, § 8.07(a), and are governed by the following guidelines:

(a) *Guidelines.*—(1) A local jurisdiction shall adopt guidelines for rehabilitation and new construction design for

---

**28.** The term "external features" refers generally to the "appearance, color, texture or materials, and architectural design of the exterior" of buildings located on the historically significant property. *Faulkner v. Town of Chestertown*, 290 Md. 214, 224, 428 A.2d 879, 883 (1981) (citing Arden H. Rathkopf & Daren A. Rathkopf, The Law Of Zoning And Planning § 15.01 (4th ed.1975)).

designated sites, structures, and districts that are consistent with those generally recognized by the Maryland Historical Trust. (2)(i) The guidelines adopted under this section may include: 1. Design characteristics intended to meet the needs of particular types of sites, structures, and districts; and 2. Identification of categories of changes that are so minimal in nature that they do not affect historic, archeological, or architectural significance and require no review by a historic district commission or historic preservation commission. (ii) A historic district commission or historic preservation commission shall use the guidelines in the commission's review of applications.

*(b) Review of application.—In reviewing applications, a commission shall consider: (1) The historic, archeological, or architectural significance of the site or structure and its relationship to the historic, archeological, or architectural significance of the surrounding area; (2) The relationship of the exterior architectural features of the structure to the remainder of the structure and to the surrounding area; (3) The general compatibility of exterior design, scale, proportion, arrangement, texture, and materials proposed to be used; and (4) Any other factors, including aesthetics, which the historic district commission or historic preservation commission considers pertinent.*

Article 66B, § 8.06 (emphasis added). Unless the HDC is persuaded that the proposed action "will not materially impair the historic, archeological, or architectural significance of the site or structure," it must reject the permit application. Article 66B, § 8.09(a)(2).

In the case of a historic demolition permit application, the HDC, in conjunction with the applicant, is obligated expressly to attempt to formulate an economically feasible plan for preservation of the property. Article 66B, § 8.09(a)(1). If no economically feasible plan initially is agreed upon, the HDC has 90 days from that date to "negotiate with the owner and other parties to find a means of preserving the site or structure." Article 66B, § 8.09(b). In the event that no alternative can be negotiated by the parties, the HDC

may approve proposed construction, reconstruction, alteration, moving, or demolition, despite the fact that the changes [apply to a historically designated property], if: (1) The site or structure is a deterrent to a major improvement program which will be of substantial benefit to the local jurisdiction; or (2) The retention of the site or structure would: (i) *Cause undue financial hardship to the owner;* or (ii) Not be in the best interests of a majority of persons in the community. Article 66B, § 8.10 (emphasis added).

If, on the other hand, a property not designated for protection as a historic property is the subject of a demolition permit, the procedure is different. Proposed activities with regard to improvements or structures on properties not subject to Article 66B, tit. 8 are governed by the basic building code, found at Chapter 5, Article V of the Rockville City Code.[29] In terms of technical standards, the City adopted, with some modifications, the Building Officials and Code Administrators International, Inc., (BOCA) National Building Code, 1996 Edition. Rockville City Code § 5–86. Under this regulatory scheme, a permit application must be submitted to the Rockville Community Planning and Development Services Department, Inspection Services Division, by the owner or lessee of the structure, BOCA § 107.2, for any number of property development activities, including, but not limited to, construction, addition, alteration, or demolition of structures located in the property. BOCA § 107.1. No work may be completed without a permit. *Id.*

Section 108.0 of the Building Code governs generally the issuance of permits. Upon application, the Inspection Services Division examines all applications for permits "within a reasonable time after filing." BOCA § 108.1. "If the applica-

---

**29.** The stated purpose and intent of the basic building code "is to govern the design, construction, alteration, repair, addition, removal, demolition, use, location, occupancy and maintenance of all buildings and structures and their service equipment as herein denied, except as some of such matters may be described in public, local or general laws of the State, zoning and other ordinances or regulations having legal precedence." Rockville City Code § 5–67.

tion or the *construction documents* do not conform to the requirements of all pertinent laws, the code official shall reject such application in *writing,* stating the reasons therefor. If the code official is satisfied *that the proposed work conforms to the requirements of this code and all laws and ordinances applicable thereto,* the code official shall issue a permit therefor as soon as practicable." *Id.* (emphasis added). In other words, the technical and procedural requirements by which a demolition permit is issued are less restrictive and more straightforward than if the property is designated properly as historic.

▆▆▆▆ Returning to consideration of whether the Mayor and Council of Rockville were required to consider economic feasibility when determining whether to designate as historic the Property, we look first to the plain language of the statutory scheme. Our goal in construing any regulatory scheme is to "extract and effectuate the actual intent of the Legislature in enacting the statute." *Reier v. State Dep't of Assessments and Taxation,* 397 Md. 2, 26, 915 A.2d 970, 984 (2007) (citing *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004); *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003)). Our inquiry in this regard begins with a reading of the plain language of the statutory text. *Walker v. Dep't of Human Res.,* 379 Md. 407, 420, 842 A.2d 53, 62 (2004). If the legislative intent is clear from this plain language reading, there is normally no need to probe further, and our inquiry comes to an end. *Id.* (citing *Allstate v. Kim,* 376 Md. 276, 290, 829 A.2d 611, 619 (2003)).

▆▆▆▆ Applying these principles to Article 66B, § 8.02, we observe that the statute is silent as to whether the local legislative body, in designating properties as historic areas, must consider the economic feasibility of preservation of a property and any financial hardship to the landowner. By the same token, the absence from the statute of such criteria may portend that the Mayor and Council is not precluded under the statutory scheme from considering economic feasibility and financial hardship at this juncture; however, the issue

here is whether the local legislature is *required* by the language of Article 66B to consider the economic impact of preservation at the time of determining whether a site is historically or architecturally significant to be protected. We conclude that it is not.

The singular consideration indicated expressly by the General Assembly in Article 66B, § 8.02, by which the local legislative body must consider amendments to the historic area zone is whether a subject property has "historic, archeological, or architectural significance." As indicated *supra,* this determination of significance appears to be guided, at least in Rockville, by twelve enumerated criteria deemed characteristic of a property suitable for designation. Noticeably absent from the checklist is the economic impact of preservation should the property be included in the historic district. It is only after the property is designated historic and a development permit application is maintained by the landowner that the statutory scheme contemplates economic feasibility and financial hardship as required factors in determining whether a permit should be issued and on what conditions. The plain language of the governing statutory scheme indicates that, rather than the local legislative body charged with deciding finally the question of historic designation, it is the HDC in the first instance that is delegated the task of reviewing, approving, or rejecting any requests to alter, add to, or demolish the exterior of buildings on historic properties, Article 66B, § 8.05(b), and that more appropriately considers, among the other factors, the economic feasibility and financial hardship of retention, restoration, or renovation. Article 66B, §§ 8.06(b), 8.09, and 8.10. It is in those statutes governing the HDC's decision to grant or deny the underlying historic area development permit, and solely in those statutes, that the financial implications of preservation, notwithstanding the site's historic significance, are mandated by the legislative scheme for consideration. Article 66B, §§ 8.09, 8.10. Petitioner's demand that the Mayor and Council's historic designation decision here should be vacated for failure to consider economic feasibility because the Property, at the time of the filing and substantial completion of the review of the permit

application for other than historic designation, is not compelling. The statutes make no distinction in terms of how and in what order, relative to the processing of a qualifying permit application, a property may be nominated for historic designation.

"[W]hen the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language.'" *Design Kitchen & Baths v. Lagos,* 388 Md. 718, 729, 882 A.2d 817, 823 (2005) (quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 758 (1993)). Nor may a court "construe the statute with 'forced or subtle interpretations' that limit or extend its application." *Lagos,* 388 Md. at 729, 882 A.2d at 823–24 (quoting *Condon,* 332 Md. at 491, 632 A.2d at 758; *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986)). Taking into consideration that economic feasibility is contemplated specifically as a consideration at a certain point in the statutory scheme, if the Legislature intended that the Mayor and Council consider, in deciding whether an historic designation was appropriate, the economic feasibility of preserving a property in a situation such as the one presented in this case, it is not unreasonable to assume that the Legislature would have provided explicitly for such a consideration in Article 66B. Although Article 66B neither contemplates the factual scenario presented here nor precludes specifically the Mayor and Council from considering economic feasibility, the statutory scheme does not place an affirmative obligation on the Mayor and Council to consider the factor in reaching a historic designation decision. Thus, failing to consider that factor in this case was not arbitrary, capricious, or otherwise contrary to law. It was not arbitrary or unreasonable for the Mayor and Council to defer, in the first instance, to an administrative governmental body theoretically qualified to consider such economic matters, i.e., the Historic District Commission,[30] in the course of acting on the demolition permit application.

---

30. Specifically, the HDC is composed of five members, each of whom is supposed to possess "a demonstrated special interest, specific knowl-

By deferring in the first instance to the HDC's later consideration of economic feasibility and withholding until that body weighs-in final action on the demolition permit, pending evaluation of the historic significance of the Property, Respondent followed the City's established procedures pertaining to the review of proposed development-related activities. The Mayor and Council, on 26 July 1999 adopted, in Resolution No. 11–99, certain "Environmental Guidelines for the Protection and Enhancement of the City's Natural Resources." Resolution No. 11–99 (26 July 1999) reads as follows:

WHEREAS, *the preservation of the City's natural resources is important to the health, well-being and quality of life for the residents and workers in, and visitors to, the City of Rockville;* and

WHEREAS, *development activity with the City* has, and will continue to have, an *impact on the City's natural resources;* and

WHEREAS, in September 1997 the Mayor and Council appointed an Environmental Guidelines Task Force to consider and develop a comprehensive and cohesive method for the protection and enhancement of the City's existing natural resources *during and after the development process;* and

WHEREAS, the Task Force drafted and submitted to the Mayor and Council Draft Environmental Guidelines ("Environmental Guidelines for the Protection and Enhancement of the City's Natural Resources, Final Draft Report to the Mayor and Council of Rockville, October 1998") *designed to insure that adequate consideration is given the impact of development activity on the City's natural resources in an effort to avoid, minimize, and/or mitigate the impact on those resources;* and

---

edge, or professional or academic training in such fields as history, architecture, architectural history, planning, archaeology, anthropology, curation, conservation, landscape architecture, historic preservation, urban design, or related disciplines." Article 66B, § 8.03(2)(i) and (ii).

WHEREAS, the Draft Environmental Guidelines were thereafter referred to the Planning Commission for evaluation and recommendation after receiving public input; and

WHEREAS, the Planning Commission held an open house on January 7, 1999 and a public hearing on the Draft Guidelines on January 20, 1999, and, following a worksession held on April 28, 1999, did unanimously recommend that the Mayor and Council adopt the Drafter Environmental Guidelines with certain changes; and

WHEREAS, *the Mayor and Council concurs in the recommendation of the Planning Commission and finds such Environmental Guidelines to be in the public interest and to further the City's goal of protecting its natural resources.*

NOW, THEREFORE, BE IT RESOLVED, BY MAYOR AND COUNCIL OF ROCKVILLE, MARYLAND that the attached document entitled "Environmental Guidelines for the Protection and Enhancement of the City's Natural Resources, Final Draft Report to the Mayor and Council of Rockville, October 1998" is hereby adopted.

(emphasis added).

The purposes of the environmental guidelines, as adopted by Resolution 11–99, are to "establish a comprehensive and cohesive method to protect the city's existing natural resources *during and after the development process*," as well as to "provid[e] for the identification of existing natural resources and presenting various environmental management strategies and criteria to govern development within the City of Rockville." CITY OF ROCKVILLE, ENVIRONMENTAL GUIDELINES TASK FORCE, ENVIRONMENTAL GUIDELINES FOR THE PROTECTION AND ENHANCEMENT OF THE CITY'S NATURAL RESOURCES 5 (1999) (emphasis added) (hereinafter "ENVIRONMENTAL GUIDELINES"). To that end, the guidelines are intended to set forth the City's internal policies [31] to be executed by City Staff, the Planning

---

**31.** "These environmental guidelines are intended to set forth certain City policies and planning objectives, and to identify, for developers and

Commission, the HDC, and in some instances, the Mayor and Council, as early as possible in the formal review process of proposed land development. *Id.* at 7.

█ Under the adopted guidelines, it is the responsibility of an applicant to submit, prior to City staff review or approval of a proposed development project, a Natural Resources Inventory (NRI). With the stated purpose of ensuring environmentally sensitive design during the earliest phases of the development, particularly those stages of development which occur prior to permit application or approval, the NRI constitutes "a complete analysis of existing natural, cultural, historic, and archaeological resources and [which] contain[s] specific information covering the development site and the first 100 feet of adjoining land or the width of the adjacent lot. . . ." *Id.* at 9. In addition to the completion by the applicant of an NRI, a pre-submission meeting should occur between City Preservation staff and the applicant during which time the participants are supposed to determine the existence of resources on the site which possess cultural, historic, or archeological/architectural significance. *Id.* at 25. "As a general guide, [according to the guidelines,] any structure older than 50 years of age or possessing architectural significance, or a site associated with a person or even of importance to local, state, or national history or development, should be examined to determine significance." *Id.* Included in the given examples are dwellings and outbuildings. If the pre-submission meeting results in the discovery of a potentially significant resource, the structure should be included in the NRI map, *id.* at 25, and "should be referred to the HDC and the MHT [Maryland Historic Trust] for a recommendation as to their cultural and historic significance to the area. The final determination of the site's legal designation as a historic district is made by the Mayor and Council through the Local Map Amendment process, which includes a public hearing." *Id.* at 40.

---

citizens alike, environmental development standards and guides." EN-VIRONMENTAL GUIDELINES, *supra,* at 7.

Examining the procedures employed by the HDC and Mayor and Council in the present case, it was neither improper nor unauthorized for the City to follow the adopted guidelines when it withheld issuance of the demolition permit, pending review of the historical significance of the Property. Assuming, *arguendo*, that we were to accept Petitioner's argument that the guidelines merely are "discretionary" and lack binding force of law,[32] we do not accept the conclusion that it was

---

**32.** Petitioner argues that it was legal error for the Mayor and Council and the HDC to apply the guidelines to the demolition permit application because the "Environmental Guidelines" are goal-oriented "discretionary" guidelines, rather than binding law. Because the environmental guidelines were adopted by resolution, rather than ordinance, something more informal in terms of its binding nature is implied. *See Inlet Assoc. v. Assateague House Condo. Assoc.*, 313 Md. 413, 427–28, 545 A.2d 1296, 1301–04 (1988). We note additionally the difference between goal-oriented standards for environmental quality and mandatory regulations. *See Rochow v. Maryland Nat'l Capital Park & Planning Comm'n*, 151 Md.App. 558, 603–04, 827 A.2d 927, 954–55 (2003) (describing the differences between goal-oriented "standards for environmental noise" and mandatory noise exposure maximums) (citing *Anne Arundel County Fish & Game Conservation Ass'n, Inc. v. Carlucci*, 83 Md.App. 121, 126–27, 573 A.2d 847, 850 (1990) (distinguishing between 24 hour standards, which are based on averages, and day-night maximum exposure limits, which are not based on averages), *cert. denied*, 320 Md. 800, 580 A.2d 218 (1990)). The guidelines speak in terms of the "goals" to be attained in protecting the City's natural, cultural, historic, and architectural resources, and contain some discretionary language, *see, e.g.,* ENVIRONMENTAL GUIDELINES, *supra*, at 25 ("The existence of significant cultural, historic, or archeological resources on a site *should* be determined at a pre-submission meeting with City Preservation staff. As a general guide, any structure older than 50 years of age or possessing architectural significance, or a site associated with a person or event of importance to local, state, or national history or development, *should* be examined to determine significance.") (emphasis added). At the same time, however, the guidelines also contain more directory language. *See, e.g.,* ENVIRONMENTAL GUIDELINES, *supra*, at 7–8 ("Deviations from these Guidelines may be allowed when it can be satisfactorily demonstrated that strict compliance would unreasonably impact development of the site or undermine other environmental or planning considerations, provided that it can be demonstrated that safety, City road standards, storm drainage, SWM, erosion and sediment control, forest conservation, stream protection, park buffers, engineering, design, and planning issues can be satisfactorily addressed. Deviations from these Guidelines may be allowed where strict compliance would conflict with infrastructure or

arbitrary, capricious, or otherwise improper for the City to administer its own adopted guidelines by utilizing the pendency of the demolition permit application as a trigger to consider the historic or architectural significance of the Property. The stated purpose of the guidelines are to prevent the premature destruction of natural resources without considering first their significance to the surrounding community. That the guidelines may not be mandatory does not mean that it was "unwarranted, unfair to the property owner, and contrary to the authority of the HDC" for it to apply the guidelines. It is the HDC's stated policy, presumably in light of the aforementioned environmental guidelines, that "[a] structure that is the subject of a demolition application and is at least 50 years of age is automatically reviewed by Historic Preservation Office staff and the Historic District Commission (HDC) for significance to the City under the Environmental Guidelines." City of Rockville, *Historic District Eligibility Information,* at http://www.rockvillemd.gov/historic/hd-criteria.html.[33] The historic designation proceedings employed by the City in the present case were not imposed arbitrarily on Petitioner. Rather, Respondent followed those procedures outlined in the Environmental Guidelines. It was not improper for the City to determine historical and architectural significance as a precursor to a final decision whether to grant or reject a permit application to demolish a structure over 50

---

other development components specifically authorized by an approved Concept Plan Application or Exploratory Application.").

**33.** Even were we to view the HDC's policy as self-serving and published on its website solely as a consequence of the present litigation, the Environmental Guidelines, created and adopted by the City of Rockville years prior to the filing of the permit application to demolish the Spates Bungalow, provide specifically for a review of historic significance prior to permit approval for development activities.

years old, regardless of the means by which the City becomes aware of the building's age.[34,35]

---

**34.** We reject Petitioner's argument that the Environmental Guidelines were intended to apply only to larger development projects, and not to relatively small sites such as 115 Park Avenue. Petitioner relies on the following language from the guidelines: "[These environmental guidelines] are intended ... to be administered in concert with other planning goals. Examples of other factors that shall be taken into consideration are: infrastructure requirements; open space objectives for public parks and forest conservation; and prior commitments to landowners, neighborhoods and individual citizens, among others. *Particular flexibility may be necessary where the Guidelines are applied to small lots and/or re-development proposals.*" ENVIRONMENTAL GUIDELINES, *supra,* at 7 (emphasis added).

Indeed, "[t]hese Guidelines allow for flexibility to best achieve environmental and other planning objectives on a site-by-site basis." *Id.* *"When flexibility in a particular application of the Environmental Guidelines is requested, [however,] the developer will be expected to include a mitigating or offsetting component within the overall development proposal. In other words, give and take will be expected."* *Id.* (emphasis added). The guidelines do not indicate, as Petitioner argues, that the "Environmental Guidelines requirements were not applicable to this property as they are intended to apply to sites with larger planned development." Nowhere in the guidelines is it stated that they were not intended to apply to small development sites. The guidelines merely indicate that they should be applied in a *flexible manner* when a smaller site is involved.

**35.** Nor did the City's referral to the HDC and Mayor and Council constitute a failure to follow its own ordinances and regulations. *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 268, 74 S.Ct. 499, 504, 98 L.Ed. 681 (1954). A plain reading of the BOCA code, which governs the issuance of development permits for property not declared historically significant at the time a demolition permit application is filed, indicates that permits may not be issued until it is determined that the permit would otherwise comport with other rules, regulations, ordinances, or statutes. Section 101.2 of the BOCA provides, for example, that "[t]hese [BOCA] regulations shall control all matters concerning the construction, ..., demolition, ..., and shall apply to existing or proposed buildings and structures, *except as such matters are otherwise provided for in other ordinances or statutes, or in the rules and regulations authorized for promulgation under the provisions of this code."* (emphasis added). BOCA § 108.1, furthermore, requires "[t]he code official [to] examine or cause to be examined all applications for permits and amendment thereto within a reasonable time after filing." Only *"[when] the code official is satisfied that the proposed work conforms to the requirements of this code and all laws and ordinances applicable thereto,* [that] the code official shall issue a permit therefor as soon as practicable." BOCA § 108.1. Thus, the BOCA

That the Mayor and Council was not required to consider the economic feasibility of preservation of the Spates Bungalow at the stage of the process when it determined the Property worthy of historic designation is all the more reasonable when one considers the purposes underlying historic area zoning. In addition to "enhanc[ing] the quality of life by preserving the character and desirable aesthetic features of a city ...," *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 129, 98 S.Ct. 2646, 2661–62, 57 L.Ed.2d 631 (1978),[36] historic area zoning serves also the purpose of preventing the premature destruction of historically important structures, landmarks, and geographic areas without first considering adequately their significance. *Penn Cent. Transp. Co.,* 438 U.S. at 108, 98 S.Ct. at 2651, 57 L.Ed.2d 631 ("Historic and landmark preservation will be upheld absent arbitrary designation or a taking without just compensation since there is a valid public purpose to such ordinances. *The public purpose is to prevent the destruction of historic* buildings without adequate consideration of their value or significance in enhancing the quality of life for all and to provide for the potential for preservation.") (emphasis added); *see also* Article 66B, § 8.01(b)(1) ("It is a public purpose in this State to preserve sites, structures, and districts of historical, archeological, or architectural significance and their appurtenances and environmental settings."); Article 66B, § 8.01(c)(1) (stating that one of the purposes of historic area zoning is to "[s]afeguard the heritage of the local jurisdiction by preserving sites, structures, or districts which reflect elements of cultural, social, economic, political, archeological, or architectural history[,] ... [s]tabilize and improve the property values of those sites, structures, or districts[,] ... [f]oster civic

---

provides that the permit authority must issue the permit as soon as possible only upon a finding that the permit comports otherwise with all applicable laws, regulations, and ordinances.

**36.** For a more general discussion regarding the potential uses of zoning ordinances in order to "enhance the quality of life by preserving the character and desirable aesthetic features of a city," see, for example, *New Orleans v. Dukes,* 427 U.S. 297, 304–05, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); and *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).

beauty[,] . . . [s]trengthen the local economy[,] . . . and [p]romote the preservation and appreciation of those sites, structures, and districts for the education and welfare of the residents of each local jurisdiction."); *Mayor & Aldermen of City of Annapolis v. Anne Arundel County*, 271 Md. 265, 291, 316 A.2d 807, 821 (1974) ("Historic area zoning [is directed] only at the preservation of the exterior of buildings having historic or architectural merit."). When a permit application is filed for the demolition of a structure as old as the Spates Bungalow, it was not entirely unreasonable for the City to delay its too hasty or premature destruction without considering first the historic/architectural significance of the Property. We agree with the Court of Special Appeals that, "[u]nder the statutory scheme set forth in Article 66B, the [M]ayor and [C]ouncil determine if a site should be preserved [i.e., that the site is valuable because it holds architectural, cultural, or historical significance]. Once that decision is made the HDC determines how, and to what extent, a site is preserved."

### 2. *Broadview Apartments Co. is Distinguishable From the Present Case.*

In support of the proposition that it was improper for the Mayor and Council to decline to consider economic feasibility during the historic designation process,[37] Petitioner draws an analogy to *Broadview Apartments Co. v. Commission for Historical and Architectural Preservation*, 49 Md.App. 538, 433 A.2d 1214 (1981). The Court of Special Appeals concluded

---

**37.** Petitioners also argued before the Historic District Commission (by letter dated 16 October 2001) and again before the Mayor and Council (by letter dated 24 January 2002) that, in light of *Broadview Apartments Co. v. Commission for Historical and Architectural Preservation*, 49 Md.App. 538, 433 A.2d 1214 (1981), "even if the [HDC] were inclined to favor designation despite the facts disproving the [P]roperty's architectural and historical significance, consideration must be given to the impracticability of renovating and maintaining the [P]roperty. The Maryland Court of Appeals has held that the designation of a property as historic *may result in a taking where renovation of the property is not economically feasible.*" Aside from the fact that *Broadview* was a Court of Special Appeals's opinion from which this Court denied a petition for writ of certiorari, 291 Md. 773, 433 A.2d 1214 (1981), the intermediate appellate court in that case declined expressly to address a takings claim asserted by the land owner. *Broadview Apartments Co. v. Comm'n for Historical & Architectural Preservation*, 49 Md.App. at 546, 433 A.2d at 1218.

in *Broadview* that Baltimore City erred in failing to consider economic feasibility before denying a demolition permit. Even though *Broadview* and the present case arose similarly from a demolition permit application process, we conclude that Petitioner's *Broadview* analogy is flawed.

Under the City of Baltimore's historic zoning regulations at issue in *Broadview*, the Commission for Historical and Architectural Preservation (CHAP) was created for the purposes of administering the Baltimore City Code's historic zoning provisions. Those provisions, similar to the historic zoning regulations in Rockville, were aimed at preserving "area[s] in Baltimore City wherein there are located structures which have historical, cultural, educational and/or architectural value, the preservation of which is deemed to be for the educational, cultural, economic and general welfare of the inhabitants of Baltimore City." Baltimore City Code, Article 1, § 40(a). One of the CHAP's primary duties under the Code was to compile a proposed "Landmark List," subject to approval by the City Council, of structures both within and outside current historic zones, Baltimore City Code, Article 1, § 40(k), which had "historical, cultural, educational and/or architectural value . . ." as defined by Baltimore City Code, Article 1, § 40(a). *Broadview Apartments Co.*, 49 Md.App. at 540, 433 A.2d at 1215. Once a property was approved by the City Council for inclusion in the Landmark List, after notice and hearing before the Council, that property became subject to the City's historic zoning laws. Baltimore City Code, Article 1, § 40(q). Of particular consequence, the "principal restriction [once the historic designation takes effect] [wa]s that a permit must be obtained from the Commissioner of Housing and Community Development [ ] before any person may alter the exterior appearance of any structure within a historic district or on the landmark list." *Broadview Apartments Co.*, 49 Md.App. at 540, 433 A.2d at 1215; Baltimore City Code, Article 1, § 40(q)(1). Even though the Housing and Community Development Commission ("HCD") was the governmental body that actually granted or denied a demolition permit, it was the CHAP that had ultimate authority over the permit applica-

tion's fate.[38] *Id.* Specifically, the permit could be issued by the City, despite the historic, educational, cultural, or architectural significance of the property, if the CHAP determined that the proposed development activity was "without substantial detriment to the public welfare and without substantial derogation from the intents and purposes of this ordinance, and denial of the application w[ould] result in substantial hardship to the applicant." Baltimore City Code, Article 1, § 40(q)(5)(ii). If the CHAP concluded that the alteration was inappropriate and declined to authorize issuance of the permit, then issuance was postponed for up to six months, during which time the CHAP would "meet with the applicant for the permit and . . . consult with civic groups, public agencies and interested citizens to ascertain what the City may do to preserve such building." *Broadview Apartments Co.,* 49 Md.App. at 541, 433 A.2d at 1215–16 (quoting Baltimore City Code, Article 1, § 40(q)(9)).

In *Broadview,* forty-two structures, including the particular apartments at issue there, tentatively were approved on 17 December 1976 for designation on the Landmark List. *Broadview Apartments Co.,* 49 Md.App. at 542, 433 A.2d at 1216. Broadview Apartments Co. applied on 10 February 1977 for a demolition permit in order to clear the land and erect a parking structure which would accommodate the adjacent commercial space the company owned and operated. *Id.* The CHAP notified Broadview by letter, dated 16 February 1977, that the property was going to be recommended for designa-

---

**38.** Under the statutory scheme, the HCD could issue a permit only upon the CHAP approval, which came in the form of either a Certificate of Appropriateness or a Notice to Proceed. *Broadview Apartments Co.,* 49 Md.App. at 540, 433 A.2d at 1215; Baltimore City Code, Article 1, § 40(q)(3). The CHAP would issue a Certificate of Appropriateness when it determined that alteration was "appropriate to the preservation of" the structure. *Broadview Apartments Co.,* 49 Md.App. at 540, 433 A.2d at 1215; Baltimore City Code, Article 1, § 40(q)(5)(i). A Notice to Proceed, on the other hand, came into play when the proposed alteration was not appropriate for preservation, but nevertheless was necessary because of some other factor, such as the financial hardship of preservation upon the property owner. *Broadview Apartments Co.,* 49 Md.App. at 540–41, 433 A.2d at 1215; Baltimore City Code, Article 1, § 40(q)(5)(ii).

tion, and a formal recommendation followed two days later. *Id.* The Housing and Community Development Commission notified Broadview on 17 April 1977 that it was withholding the permit pending City Council review of the property. *Id.* The property was designated on the list officially by the City Council on 10 June 1977.

It was not until two years later, and after a petition for writ of mandamus was filed to compel issuance of the permit, that the City conducted a hearing on the demolition permit application. *Broadview Apartments Co.,* 49 Md.App. at 542, 542 n. 2, 433 A.2d at 1216, 1216 n. 2. Despite a multitude of reports from experts reflecting the deteriorated condition of the property, the need for extensive repair, and the inability of the owner to recoup the costs through any conceivable rent structure, the CHAP denied Broadview's demolition permit on the grounds that "they were not convinced from the evidence that Broadview was under any economic hardship." *Broadview Apartments Co.,* 49 Md.App. at 543, 544, 433 A.2d at 1216, 1217. With the exception of one report, which was significantly flawed according to the intermediate appellate court, all written accounts relied upon by the CHAP concerning economic feasibility stated, in a conclusory manner and without any supporting data, that renovation was feasible. *Broadview Apartments Co.,* 49 Md.App. at 544, 433 A.2d at 1217.

After the Baltimore City Court upheld on 15 July 1980 the CHAP's decision to deny the permit to demolish the structure, *Broadview Apartments Co.,* 49 Md.App. at 544, 433 A.2d at 1217, Broadview noted an appeal to the Court of Special Appeals. In that appeal, Broadview advanced the following arguments:

1. [The] CHAP's decision denying the permit was arbitrary, capricious, and not supported by substantial evidence;

2. The preservation law does not provide objective standards for its criteria to guide [the] CHAP in its decision making and therefore is unconstitutionally vague; and

3. Denial of the demolition permit constitutes an unconstitutional "taking" under the 5th and 14th Amendments. *Broadview Apartments Co.,* 49 Md.App. at 539, 433 A.2d at 1214.

The Court of Special Appeals began its analysis by confirming that "[a]lthough every restriction imposed by government upon a landowner's use of his property will not be considered a taking, where the restrictions deprive the landowner of all reasonable, beneficial uses of the property, compensation must be paid." *Broadview Apartments Co.,* 49 Md.App. at 544–45, 433 A.2d at 1217 (citations omitted). According to the court, "the sole evidence in the record before [the] CHAP which supported its decision was the study [which] ... failed to include any debt service, any recovery of the purchase price, and failed to include the cost of replacing the roof, even though the City itself ... agreed that replacement of the roof was necessary." The Court of Special Appeals concluded, as a result, that the CHAP arbitrarily ignored, in derogation of its duties under Baltimore City Code, Article 1, § 40(q), substantial evidence in the record regarding substantial hardship. The Court declined expressly to reach the landowner's second and third arguments that the preservation laws were unconstitutionally vague and that the failure to consider economic feasibility constituted a regulatory taking. *Broadview Apartments Co.,* 49 Md.App. at 546, 433 A.2d at 1218.

Petitioner's argument in the present case, advanced in its reply brief, that "the Property herein was never listed in an Historic Resources Inventory and the Trust was never given notice that the Property was being surveyed for such designation, whereas the *Broadview* site had already been 'tentatively' approved for inclusion on the landmark list and the owner never pressed the issue of financial hardship until two years after formal designation[,] [*Broadview Apartments Co.,* 49 Md.App. at 542, 433 A.2d at 1216][,]" undermines its attempted analogy to *Broadview*. The Court of Special Appeals in *Broadview* addressed whether the Baltimore City Court was correct in affirming the Commission for Historical and Architectural Preservation's denial of a demolition permit. In the

present case, Petitioner's application for a demolition permit neither has been denied nor granted.[39] The HDC has not acted finally on the application. As we stated *supra*, the designation process that Petitioner now challenges was a precursor needing resolution before confronting necessarily the required criteria actually and finally addressed in *Broadview*, *i.e.*, a final decision on the application for the demolition permit. *Broadview* does not stand for the proposition that the failure to consider economic hardship in the historic designation process is improper when, in that case, the feasibility of preservation was not brought to issue until some time after the historic designation process was resolved. At best, *Broadview* requires, in the present case, that the HDC, when it considers economic feasibility or hardship, have an adequate factual basis for its findings and conclusions in rendering a final disposition on the demolition permit application.

The procedural postures of *Broadview* and the present case are somewhat similar in a sense. The process by which the property in *Broadview* became designated for historic zoning

---

**39.** Although consideration of the demolition permit application by the HDC was not stayed formally by the Mayor and Council or the Circuit Court while Petitioner pursued judicial review of the historical designation decision, the procedural progression of the case produced a like result through implied acquiescence. The 2 October 2001 letter sent from Respondent to Petitioner stated expressly that the permit review process was going to be paused pending an evaluation of the historic/architectural significance of the Property by the HDC and Respondent. The Property was placed in the historic zone on 14 July 2003, and Petitioner sought promptly thereafter, on 7 August 2003, judicial review of the designation. The series of appeals leading up to the present case before this Court ensued in close succession. Specifically, the Circuit Court rendered its memorandum opinion on 15 October 2004. Cross-appeals were noted on 19 November 2004 with the Court of Special Appeals. The intermediate appellate court filed its opinion on 9 August 2006, and Petitioner sought a writ of certiorari from this Court shortly thereafter. By virtue of filing a petition for judicial review immediately following the designation of the Property as within the historic district, Petitioner, in effect, elected to defer pursuing a final decision on the permit application, where economic feasibility and hardship clearly would be in play, in favor of litigating the historic designation decision-making process fully, i.e., approaching the dispute *in seriatim*, rather than proceeding concurrently, before having possibly to proceed before the HDC.

protection began with its inclusion as a proposed historic and architectural preservation district on a "Landmark list" under Article 1, §§ 40(j) and (k) of the Baltimore City Code. *Broadview Apartments Co.*, 49 Md.App. at 542, 433 A.2d at 1216. This is akin to formal nomination for historic designation under the Rockville City Code. A nuanced view of the Court of Special Appeals's opinion in *Broadview* suggests a tacit judicial approval of the procedure there employed, i.e., withholding action on the permit application pending an evaluation of the historical significance of the structure. *See Broadview Apartments Co.*, 49 Md.App. at 542, 433 A.2d at 1216. While the property in *Broadview* may have been a bit further along in the designation evaluation process than the Spates Bungalow when the respective demolition permit applications were filed, neither property was designated formally as historic at the time of filing the applications. Thus, the *Broadview* property and the Spates Bungalow were subject to normal BOCA code requirements at the time of the initial pendency of their respective permit applications.

Although the Property here was not recommended formally for designation until after the permit application was filed, the record indicates that the Property was listed as a historical resource as early as 1986. Specifically, a "Maryland Inventory of Historic Properties Form," created originally for the Maryland Historical Trust in 1985 by Peerless Rockville, suggests an architectural significance basis for possible designation of the Property. Although updated in 2001, after the present controversy arose, the substance of the original inventory form mirrors closely the more contemporaneous evaluations of the historic and architectural significance of the Property.

Also the record refers to a study completed in 1999 by an architectural historian employed by the State Highway Administration (SHA) addressing the impact on the area of the Property by a proposed intersection improvement at Maryland Routes 28 and 355. In that study, Kelly Steele, the SHA's architectural historian, completed a "Maryland Historical Trust [National Register]-Eligibility Review Form." Although

the box concerning eligibility for historic designation was checked "No," the textual analysis nonetheless revealed an arguable basis for eligibility. Specifically, despite Ms. Steele's assessment that the Property was not associated sufficiently with historically significant events, trends, or persons to render it eligible for designation, she submitted that it otherwise was eligible because "it embodies distinctive characteristics of a type of architecture." According to Ms. Steele, the Spates Bungalow was "an excellent example of the Craftsman style," and stood "as a rare and outstanding representative of Craftsman architecture in Rockville, Maryland." The import of these conflicting observations suggests at least that the Property's possible historical and/or architectural significance was considered long prior to its formal nomination for designation. In that respect, the "procedural trajectories" of the facts in *Broadview* and the present case are similar enough that we conclude that the Court of Special Appeals's tacit approval of the historical designation procedure there is confirmatory of that employed here.

3. *The Mayor and Council's Refusal to Consider Economic Infeasibility at This Juncture Did Not Work a Taking of the Property Without Just Compensation.*

Petitioner contends next that, because "consideration of financial hardship [wa]s intricately tied to the decision of whether certain structures should be preserved[,]" by placing the Property in Rockville's Historic District Zone without considering during the designation process the economic infeasibility and the resultant financial hardship to the Trust of rehabilitating the Property, the Mayor and Council's decision effected a regulatory taking of the Property without due process of law or just compensation. In other words, the Trust argues that "the placement of the Property within the City's Historic District Zone has rendered the Property economically inviable." We find that Petitioner misinterprets the procedures and the property interests at stake in this case in the posture in which it reaches us.

It is well-settled that zoning regulations are a valid exercise of a government's police power so long as the limitations imposed are in the public interest and are related substantially to the health, safety, or general welfare of the community. *See, e.g., County Comm'rs of Queen Anne's County v. Miles*, 246 Md. 355, 364, 228 A.2d 450, 454 (1967); *Anne Arundel County Comm'rs v. Ward*, 186 Md. 330, 338, 46 A.2d 684, 687 (1946) ("[Z]oning, in general, is a valid exercise of the police power."); *Penn Cent. Transp. Co.*, 438 U.S. at 125–26, 98 S.Ct. at 2659–60, 57 L.Ed.2d 631("[I]n instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, [the Supreme Court] has upheld land-use regulations that destroyed or adversely affected recognized real property interests. Zoning laws are, of course, the classic example, . . ., which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property.") (citations omitted). This exercise of the local legislature's police power is not absolute, however, and, if it goes too far, may constitute a regulatory taking of the land. *Penn. Cent. Transp. Co.*, 438 U.S. at 127, 98 S.Ct. at 2660–61, 57 L.Ed.2d 631 ("[A] use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose, or perhaps if it has an unduly harsh impact upon the owner's use of the property.") (citations omitted); *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922) (stating that, while a certain piece of property may be regulated to a certain extent in support of an important public policy, the regulation may nevertheless be recognized as a taking if it goes so far as to make *any* economical use of the property commercially impracticable); *accord Maryland–Nat'l Capital Park & Planning Comm'n v. Chadwick*, 286 Md. 1, 9–10, 405 A.2d 241 (1979) ("[A] governmental action, while not rising to the status of a compensable 'taking' of property, may amount to an invalid deprivation of property rights without due process of law. . . .").

"This Court has repeatedly stated that the preservation of architecturally or historically significant areas is a valid exercise of the governmental power." *Belman v. State,* 322 Md. 207, 211, 586 A.2d 1281, 1283 (1991) (citing *Donnelly Adver. Corp. v. City of Baltimore,* 279 Md. 660, 671, 370 A.2d 1127, 1133 (1977); *City of Baltimore v. Mano Swartz, Inc.,* 268 Md. 79, 91, 299 A.2d 828, 835 (1973)). Thus, in order for the zoning regulation to constitute a taking of private property or otherwise constitute a deprivation of due process, Petitioner must "affirmatively demonstrate[ ] that the legislative or administrative determination deprives him of all beneficial use of the property. . . . But the restrictions imposed must be such that the property cannot be used for any purpose. It is not enough for the property owners to show that the zoning action results in substantial loss or hardship." *Mayor & City Council of Baltimore v. Borinsky,* 239 Md. 611, 622, 212 A.2d 508, 514 (1965); *see also State v. Good Samaritan Hosp. of Md., Inc.,* 299 Md. 310, 324–25, 473 A.2d 892, 899 (1984) ("For government restriction upon the use of property to constitute a 'taking' in the constitutional sense, so that compensation must be paid, the restriction must be such that it essentially deprives the owner of all beneficial uses of the property."); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 34, 410 A.2d 1052, 1060 (1980) ("To constitute a taking in the constitutional sense . . . the state action must deprive the owner of all beneficial use of the property. . . . [I]t is not enough for the property owner to show that the state action causes substantial loss or hardship."); *Governor v. Exxon Corp.,* 279 Md. 410, 436–37, 370 A.2d 1102, 1117 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Mayor & Council of Rockville v. Stone,* 271 Md. 655, 663–64, 319 A.2d 536, 541 (1974); *Stratakis v. Beauchamp,* 268 Md. 643, 654, 304 A.2d 244 (1973); *Cabin John Ltd. P'ship v. Montgomery Co.,* 259 Md. 661, 670, 271 A.2d 174 (1970); *Zoning Bd. of Howard Co. v. Kanode,* 258 Md. 586, 596, 267 A.2d 138 (1970); *Skipjack Cove Marina, Inc. v. County Comm'rs for Cecil County,* 252 Md. 440, 250 A.2d 260 (1969); *Franklin Constr. Co. v. Welch,* 251 Md. 715, 248 A.2d 639 (1968); see also STANLEY D. ABRAMS, GUIDE TO

MARYLAND ZONING DECISIONS 10–2 (4th ed. 2002) ("[U]nless a physical taking has occurred, a contention by a property owner that the action of a local zoning authority is confiscatory and thereby constitutes an unconstitutional 'taking' . . . without just compensation will fail unless it can be demonstrated by substantial evidence that the legislative determination deprives him of all beneficial use of the property and that the property cannot be used for any reasonable purpose under its existing zoning.").

Essential to the successful assertion of any regulatory takings claim is a final and authoritative determination of the permitted and prohibited uses of a particular piece of property. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348–49, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."); *see also Taylor Invs. Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1292 (3d Cir.1993) (holding that there is no deprivation of a concrete property interest when a municipality has not yet rendered a final decision regarding revocation of a specific use permit). Only when the governmental authority makes a final determination of the legal rights of the parties is it possible to ascertain whether all reasonable uses of the land are frustrated to the point that a regulatory taking has occurred. *Williamson Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 189 n. 11, 105 S.Ct. 3108, 3116, 3118 n. 11, 87 L.Ed.2d 126 (1985) (stating that until there is "a final decision regarding the application of the zoning ordinance and subdivision regulations to its property," "it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed."); *see also Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (stating that there must by some concrete controversy pertaining to the application of the pertinent zoning regulations in order to successfully assert an "as-applied" takings claim). This concept is otherwise known as "ripeness for review." *See Maryland Reclamation Assocs., Inc. v. Harford County,* 342 Md. 476, 502–06, 677 A.2d 567,

580–82 (1996) (explaining the practical differences between exhaustion of administrative remedies and ripeness, and concluding that a zoning ordinance does not deprive the landowner of any concrete property interests when the ordinance does not decide finally the permitted uses of a particular parcel of land).

Although not on point here, we find instructive nonetheless the Court's reasoning in *Maryland Reclamation Associates, Inc.* In that case, *Maryland Reclamation Associates, Inc.*, a Maryland corporation, contracted to purchase a tract of land in Harford County for the purposes of establishing a rubble landfill. *Maryland Reclamation Assocs., Inc.*, 342 Md. at 480, 677 A.2d at 569. The corporation sought first to include its proposal in the Harford County Solid Waste Management Plan, which the then-incumbent County Council approved initially. *Id.* Four days after Maryland Reclamation settled on its acquisition of the property,[40] however, and after initial Phase I permit approval for the rubble fill by the State,[41] the County's newly-elected Council adopted a series of ordinances removing from the Waste Management Plan Maryland Reclamation's property and increasing the minimum acreage requirements for rubble landfills to the point that the small tract of land no longer qualified for Maryland Reclamation's intended use. *Maryland Reclamation Assocs., Inc.*, 342 Md. at 481–483, 677 A.2d at 570–71. In light of these newly-passed ordinances, Maryland Reclamation, in order to operate a rubble landfill on the property, would have to obtain a lot-size variance. Instead of applying for such a variance, the corpo-

---

**40.** Maryland Reclamation Associates, Inc., consummated the sale under the assumption that the property would be able to be used as a rubble landfill based on its inclusion in the waste management plan. Also important at closing was the approval of the first phase of a three phase permit process necessary to operate a landfill. *Maryland Reclamation Assocs., Inc. v. Harford County*, 342 Md. 476, 481, 677 A.2d 567, 569–70 (1996).

**41.** By the time of settlement, the Phase I permit was approved, and the reports and studies necessary for Phase II and III approval were submitted to the reviewing governmental authorities.

ration filed an appeal with the county zoning board of appeals challenging the ordinances' application to the property. *Maryland Reclamation Assocs., Inc.*, 342 Md. at 486, 677 A.2d at 572. Losing the administrative appeal and subsequent judicial review in the Circuit Court for Harford County and the Court of Special Appeals, Maryland Reclamation convinced us to issue a writ of certiorari.

The corporation presented before this Court four arguments, two of which were grounded on the due process clauses of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. *Maryland Reclamation Assocs., Inc.*, 342 Md. at 487–88, 677 A.2d at 572–73.[42] The other two issues invoked the doctrines of "zoning estoppel" and preemption, *Maryland Reclamation Assocs., Inc.*, 342 Md. at 488, 677 A.2d at 573, neither of which is pertinent here. Of relevance, Maryland Reclamation contended that it had a "constitutionally protected property interest in the Harford County Solid Waste Management Plan," as well as "vested rights in the permit process," which the county deprived the landowner of in violation of the due process clause when it enacted the use-restrictive ordinances. *Maryland Reclamation Assocs., Inc.*, 342 Md. at 487, 677 A.2d at 573. The petitioner, in support of this contention, relied on federal case law addressing situations in which a landowner possessed some cognizable proper-

---

**42.** When asked at oral argument whether it was mounting a takings argument, Maryland Reclamation insisted that it was not. Despite this, however, "[b]oth in the circuit court and in its brief in this Court, [the petitioner] relied upon principles and cases relating to the question of whether particular governmental regulation of a landowner's use of his property had gone so far as to constitute a 'taking' of the property without just compensation in violation of the Fourteenth Amendment and the Just Compensation Clause of the Fifth Amendment and/or Article III, § 40, of the Constitution of Maryland." *Maryland Reclamation Assocs., Inc.*, 342 Md. at 488, 677 A.2d at 573. Our analysis relied in large part on the U.S. Supreme Court's reasoning in *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 189 n. 11, 105 S.Ct. 3108, 3116, 3118 n. 11, 87 L.Ed.2d 126 (1985), a case which, as we discuss *infra*, involved directly whether a county's change in zoning regulations worked a regulatory taking of the landowner's property. *See Maryland Reclamation Assocs., Inc.*, 342 Md. at 502–03, 677 A.2d at 580–81.

ty right in a land-use permit, its approval, or the approval process itself. *Id.* Relying upon the U.S. Supreme Court's decision in *Williamson Planning Comm'n*, we concluded that the corporation "ha[d] not shown that it ha[d] a constitutionally protected property interest which ha[d] been denied without due process of law." *Maryland Reclamation Assocs., Inc.*, 342 Md. at 499, 677 A.2d at 579. More specifically, we held that "[u]ntil there is some governmental determination that [the landowner] cannot proceed to operate a rubble landfill [, its intended use of the property,] under its state permit, its [cause of] action is not ripe for judicial decision." *Maryland Reclamation Assocs., Inc.*, 342 Md. at 506, 677 A.2d at 582.

In *Williamson Planning Comm'n*, the case upon which we relied principally in *Maryland Reclamation*, a developer, the respondent's predecessor in interest, obtained approval of a preliminary plan to subdivide a large tract of land in Williamson County, Tennessee. *Williamson Planning Comm'n*, 473 U.S. at 177, 105 S.Ct. at 3111, 87 L.Ed.2d 126. At the time of the preliminary plan approval, the County's regulations required that developers seek approval of subdivisions in two steps. The first step was the submission for approval of a preliminary plan indicating, *inter alia*, the basic dimensions of the site, the number of intended dwelling units, and the intended infrastructure of the subdivision. Once approved, this "initial sketch plan" served as the basis for a more detailed final plat which, once approved finally by the Williamson County Regional Planning Commission, was authenticated and recorded. *Id.* On 3 May 1973, the Commission approved the developer's preliminary plan. *Id.* In 1977, however, the County changed its zoning ordinance to reduce the permissible density of dwelling units for "cluster" development of residential properties. *Williamson Planning Comm'n*, 473 U.S. at 178, 105 S.Ct. at 3112, 87 L.Ed.2d 126. This ordinance, as applied to the subject property, would affect directly respondent's ability to develop the land as originally intended. For reasons not explained in the opinion, the Regional Planning Commission initially continued to apply the pre–1977 regulations to respondent's initial final plat submissions, allowing

respondent to develop sections of its tract of land under the former density standards. *Id.* In 1979, however, the Commission reversed its position and began disapproving proposed final plats for the undeveloped remainder of the tract based on the failure to comply with the density requirements adopted by the 1977 ordinance. *Williamson Planning Comm'n*, 473 U.S. at 178–79, 181–82, 105 S.Ct. at 3112, 3114, 87 L.Ed.2d 126. Respondent filed suit against the Commission and the County, alleging that, by refusing to approve the remaining plats, the governmental units effected a taking of its property without just compensation. *Williamson Planning Comm'n*, 473 U.S. at 182, 105 S.Ct. at 3114, 87 L.Ed.2d 126.

In concluding that respondent's claim was not ripe for judicial review, the Court began its analysis by stating that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Planning Comm'n*, 473 U.S. at 186, 105 S.Ct. at 3116, 87 L.Ed.2d 126. Important in shaping the Court's view was the fact that, when the Commission rejected respondent's plat as not conforming to the revised ordinance, "respondent did not then seek variances that would have allowed it to develop the property according to its proposed plat, notwithstanding the Commission's finding that the plat did not comply with the zoning ordinance and subdivision regulations." *Williamson Planning Comm'n*, 473 U.S. at 187–89, 105 S.Ct. at 3117–18, 87 L.Ed.2d 126. Whether a governmental regulation effects a taking of property depends, according to the Court, in large measure on "the economic impact of the challenged action and the extent to which it interferes with [the landowner's] reasonable investment-backed expectations." *Williamson Planning Comm'n*, 473 U.S. at 191, 105 S.Ct. at 3119–20, 87 L.Ed.2d 126. "Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson Planning Comm'n*, 473 U.S. at 191,

105 S.Ct. at 3120, 87 L.Ed.2d 126. In other words, the party asserting that a taking has occurred must be able to demonstrate some actual, concrete injury occasioned by the imposition of a final application to the property of the challenged regulatory scheme or decision. *Williamson Planning Comm'n*, 473 U.S. at 192–93, 105 S.Ct. at 3119–20, 87 L.Ed.2d 126.

> In light of those principles of law, the Court concluded that [r]esort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents respondent from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances. In short, the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision.

*Williamson Planning Comm'n*, 473 U.S. at 193–94, 105 S.Ct. at 3120, 87 L.Ed.2d 126; *see also Hodel v. Virginia Surface Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981) ("There is no indication in the record that appellees have availed themselves of the opportunities provided by the [Surface Mining Control and Reclamation Act of 1977] to obtain administrative relief by requesting either a variance ... or a waiver from the surface mining restriction."). The denial of a proposed plat, in other words, was not the equivalent of the denial of a variance and, "[b]ecause respondent ha[d] not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property ...," the Court concluded that "respondent's claim [wa]s not ripe [for judicial decision]." *Williamson Planning Comm'n*, 473 U.S. at 186, 105 S.Ct. at 3116, 87 L.Ed.2d 126.

 Just as the parties' claims were not ripe for judicial review in *Williamson Planning Comm'n and Maryland Reclamation Associates, Inc.*, we conclude that Petitioner's regulatory takings claim in the present case likewise is premature. Whether Petitioner may maintain a regulatory takings claim depends on final action on the demolition permit application, during which deliberation process the factor of undue financial hardship of preservation must be confronted squarely by the HDC and Respondent. Determining that the Property should be deemed historic does not terminate the proceedings between the parties to such a decree that all that remains to be done is to enforce by execution the disposition of the controversy. *See, e.g., Grimberg v. Marth,* 338 Md. 546, 551–52, 659 A.2d 1287, 1289–90 (1995) (quoting *In re Buckler Trusts,* 144 Md. 424, 427, 125 A. 177, 178 (1924); *Walbert v. Walbert,* 310 Md. 657, 661, 531 A.2d 291, 293 (1987)). In the absence of such a final determination of the permitted use of the Property, and in particular the fate of the Spates Bungalow, there is no way of ascertaining whether Petitioner has been deprived of a concrete property interest sufficient to render any governmental action a taking.

As the intermediate appellate court noted, Petitioner equates historic designation of the Property with denial of the demolition permit when, in actuality, the former does not lead necessarily to the latter. To the contrary, once the Property was designated as historic, the HDC still must review the permit application under the regulatory scheme set forth in Article 66B, §§ 8.01–8.17, at which time there will be ample opportunity for all interested parties to have adjudicated fully the issues concerning the economic feasibility of preserving the Spates Bungalow. As we have stated *supra,* whether a regulation has such an economic impact on a property that it interferes with all reasonable investment-backed expectations depends in large part on whether that regulation works a regulatory taking of the property. *Williamson Planning Comm'n,* 473 U.S. at 191, 105 S.Ct. at 3119–20, 87 L.Ed.2d 126. The entire purpose of Article 66B, § § 8.09 and 8. 10, two provisions which have yet to be applied by the HDC to the

now-designated Property, consider precisely those economic impacts. In short, the filing of the local map amendment to rezone the Property with a historic district overlay zone did not "seal its fate," and the Mayor and Council's decision to designate the Property as historical still leaves open the real possibility that the Trust yet may be able to demolish the Spates Bungalow.[43] Until there is some governmental determination by the HDC, or otherwise,[44] that Petitioner may not proceed with its demolition plans or other financially fruitful uses of the Property, there is no way to determine with any particularity how historic designation ultimately will affect the use of the Property.[45] As a result, the takings claim is not

---

**43.** Pragmatists and skeptics may deem this assumption "pollyannish;" but it is the only objective one that may be drawn from this record.

**44.** Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 8.15, provides that "[a]ny person aggrieved by a decision of a historic district commission or historic preservation commission may appeal the decision in the manner provided for an appeal from the decision of the zoning board or commission of the local jurisdiction." Rockville City Code provides furthermore that "[a]ny person aggrieved by an decision of the [Historic District] Commission may appeal the same to the Circuit Court for [Montgomery County]. Such appeal shall be taken according to the Maryland Rules as set forth in Chapter 1100, Subtitle B." Rockville City Code § 25–75. This includes any decision related to the issuance or denial of a permit application for the demolition of the structure located within the municipal boundaries of the City of Rockville.

**45.** Paul T. Glasgow, Rockville City Attorney, was of the opinion that the bifurcated procedure employed by the City in this case was proper. In response to Petitioner's argument made at one of the initial hearings regarding historical designation of 115 Park Avenue that, under Maryland law, the City was required to consider economic feasibility of restoring the property at that point in time, he replied:
Well, at this point, . . ., the issue is really not joined, so to speak. The case that was referred to here was the situation where there was a pending permit before the agency. Here we're not at that step. . . . We're at the point now of de signati[ng] this as a historic designation. After that, then depending upon what the property owner wants to do, they will have to come in for a permit. At that time, depending upon what they're asking for and what the commission determines, then the question would be appropriate, you know, is there an issue of economic unfeasibility or is there no economic possibility of saving the structure? Then that would be the time when that is right—when they actually come in for a permit seeking demolition. At this stage, though, that issue does not come up.

ripe for judicial resolution. *Maryland Reclamation Assocs., Inc.*, 342 Md. at 506, 677 A.2d at 582. As this Court stated in *Mayor of Rockville v. Stone*, 271 Md. 655, 664, 319 A.2d 536, 542 (1974), "[i]t is not with a deaf or a totally unsympathetic ear that we listen to the details of the financial disaster which may result because of this rezoning. Nevertheless, [there has been no final denial of the demolition permit], and, accordingly we do not find that this property has been unconstitutionally confiscated."

Petitioner nonetheless maintains that "[t]his matter is ripe for judicial review because the City, by withholding the Trust's demolition permit for over five years or improperly terminating the demolition review permit process, may be viewed to have made a final decision with respect thereto and the Trust's proposed use of the Property." To the contrary, no dispositive action has been taken in terms of the demolition permit application. The permit review process was never resolved finally. Rather than press that process to a conclusion in parallel proceedings to the instant litigation or via a petition for writ of mandamus, Petitioner apparently opted to litigate the dispute piece-meal, crossing its metaphorical fingers that success in a one-front war would obviate the need to go before the HDC again. We do not assume that the five year delay in acting on the permit application equates to "a final decision with respect thereto." *See supra*, note 39. As stated earlier, historical designation does not automatically

---

He continued:

At this point in time, it's just a question of whether or not this particular property has such a historic significance that it should be considered and placed in—or architectural significance or archeological significance that it should be in the historic district. If, as the Mayor said, you determine that it is of such significance, then it is put in the district.

At that point, on a case-by-case basis, then they would address the question of feasibility of renovation and whether or not an economically feasible plan could be developed to preserve the structure or what have you. So that right now that is not an issue under Maryland law where you are right now. That could become an issue before the Historic District Commission when a permit is presented for some sort of demolition or for altering the structure in some way.

equate to a denial of the demolition permit sought. The HDC, in the wake of Respondent's historic designation decision, still must determine the fate of the demolition permit by considering the various relevant factors enumerated above, which include the economic feasibility of restoration.

■ If Petitioner was as convinced, as it so adamantly contended in the proceedings below, that it was entitled legally to the demolition permit,[46] it should have petitioned the Circuit Court in a separate action, as did the property owner in *Broadview*, 49 Md.App. at 542 n. 2, 433 A.2d at 1216 n. 2,[47] for a writ of mandamus immediately upon discovering that issuance of the permit was being withheld pending historic review. A writ of mandamus issues generally "to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right." *Goodwich v. Nolan*, 343 Md. 130, 145, 680 A.2d 1040, 1047 (1996) (quoting *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 514, 331 A.2d 55, 72 (1975); *George's Creek Coal & Iron Co. v. County Comm'rs*, 59 Md. 255, 259 (1883)). Although a mandamus petition may have been denied

---

**46.** While Petitioner in its brief attempted to argue that it was not insisting on a property right in the permit itself, it made reference repeatedly that "the designation process in this case was triggered only after the Trust (1) filed an application for a demolition permit; (2) had been notified by the City that all requirements for the demolition permit had been satisfied; (3) was advised that the City would sign the permit; and (4) was told it could pick up the permit." Petitioner also argued in its brief to this Court that "[s]ubsection 108.1 [of the BOCA], 'Action on Application,' requires that permits be examined 'within a reasonable time after filing' and that if the reviewer 'is satisfied' that the 'proposed work conforms' to code requirements and 'applicable' laws and ordinances, the Development Services Department 'shall issue' the permit 'as soon as practicable.' "

**47.** There, Broadview sought in a separate cause of action a writ of mandamus on the grounds that, because of the two year delay between the date of application for a demolition permit and the eventual hearing on the permit application, the Commissioner of Housing and Community Development was "without authority to withhold the requested permit." *Broadview*, 49 Md.App. at 542 n. 2, 433 A.2d at 1216 n. 2.

by the Circuit Court, as did the Superior Court of Baltimore City in *Broadview,* which denied the petition in light of the fact that the time limitations imposed by Baltimore City's historic zoning permit process were not mandatory, *Broadview,* 49 Md.App. at 542 n. 2, 433 A.2d at 1216 n. 2, the petition for writ of mandamus might have encouraged Respondent to address the demolition permit application issue.[48]

4. *Respondent's Failure to Consider Economic Feasibility At This Juncture Was Not A Deprivation of Property Without Due Process of Law.*

Petitioner argues finally that the Mayor and City Council's failure to consider the economic impact was a denial of due process because the historic designation proceedings "contravened the rule requiring a pre-deprivation hearing, absent any exigent circumstances." Petitioner finds support in *Pitsenberger,* 287 Md. at 30, 410 A.2d at 1058, where this Court held that, "[a]t a minimum, due process requires that a deprivation of property be preceded by ... notice and opportunity for hearing *appropriate to the nature of the case....* " (emphasis added). Because there has been no infringement of a constitutionally protected property right sufficient to maintain a claim based on denial of due process, through the final determination of Petitioner's legal rights to use the Property as originally intended, *Williamson Planning Comm'n,* 473 U.S. at 197–205, 105 S.Ct. at 3122–26, 87 L.Ed.2d 126 (rejecting a landowner's property-based procedural due process claim on the grounds that the zoning ordinances at issue did not determine finally the permitted uses of the targeted land); *Pitsenberger,* 287 Md. at 27–28, 410 A.2d at 1057 ("[T]he state action [complained of] must result in a 'deprivation' of the complainant's interest, and such interest must be a 'property'

---

**48.** It should also be noted that, even if the Court of Special Appeals's opinion in *Broadview* may be read to stand for the proposition that failure to consider economic feasibility may amount to a taking, we note that the takings claim in *Broadview* was ripe because there was a final disposition by the CHAP and the HCD on the merits of the demolition permit application.

interest within the meaning of the due process clause.") (citations omitted), we find no merit in the Trust's due process argument.

"Because the power to regulate land use necessarily places the local government in the position of potentially circumscribing a citizen's rights or expectations as to the desired use for a given piece of real property, our appellate courts repeatedly have identified the source of those powers and set forth the minimum procedures necessary to insure that these powers are exercised in an appropriate manner." *Rylyns,* 372 Md. at 533, 814 A.2d at 479–80. "[O]nce it is determined that an interest is entitled to due process protection," therefore, "[a]t a minimum, due process requires that a deprivation of property be preceded by ' ... notice and opportunity for hearing appropriate to the nature of the case.' " *Pitsenberger,* 287 Md. at 30, 410 A.2d at 1058 (citing *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citations omitted)); *Boitnott v. Mayor & City Council of Baltimore,* 356 Md. 226, 244, 738 A.2d 881, 891 (1999) ("Procedural due process ensures that citizens are afforded both notice and an opportunity to be heard, where substantive rights are at issue.") (citations omitted); *Burke v. Fidelity Trust Co.,* 202 Md. 178, 188, 96 A.2d 254, 260 (1953) ("[D]ue process does not necessarily mean judicial process. It is sufficient if there is at some stage an opportunity to be heard suitable to the occasion and an opportunity for judicial review at least to ascertain whether the fundamental elements of due process have been met.") (citations omitted). "Fundamentally, due process requires the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Pitsenberger,* 287 Md. at 30, 410 A.2d at 1058.

The record in the present case indicates clearly that notice was given and hearings were conducted with respect to the adoption of Ordinance No. 19–03. It is equally clear that Petitioner, or its representative(s), was present at all of

the pertinent hearings and participated meaningfully in the decision-making process. At the initial HDC evaluation hearing conducted on 16 October 2001, Petitioner, along with other interested parties, was given an opportunity to present evidence in opposition to designation. Petitioner's counsel's request was granted to keep open the record for submission of additional evidence. Petitioner took advantage of this additional time to submit, in addition to cost estimates of renovation, a report by its expert, Daniel Koski–Karell, Ph.D., concerning what he perceived to be the Property's lack of historical significance. At the 28 January 2002 meeting of the Mayor and Council, convened for the purpose of considering the HDC's recommendation for historic designation, Petitioner was again present and participated in the meeting. Counsel for Petitioner spoke also at the Planning Commission's 8 May 2002 hearing regarding the proposed map amendment. She spoke in opposition to the designation, as did Dr. Koski–Karrell. At the 17 June 2002 Mayor and Council meeting, Petitioner again was present, through representatives, and had the opportunity to object and present evidence in opposition to the proposed designation. Thus, a series of full and fair hearings was given on the issue of the historical/architectural significance of the Property, which was the purpose of the proceedings. Respondent issued a written opinion in which it entirely apprised Petitioner of the facts relied upon in designating the Property.

In order for the historic designation proceedings to bear the flaw of a violation of due process, it must be concluded that Petitioners were not given the opportunity to be heard "at a meaningful time and in a meaningful manner." *Pitsenberger*, 287 Md. at 30, 410 A.2d at 1058. As we stated *supra*, the hearings given prior to reaching the designation decision were not inadequate. The Mayor and Council gave due consideration to the factors pertinent to the designation proceedings, i.e., the historic, cultural, and architectural significance of the Spates Bungalow, while reserving properly for the ultimate disposition on the demolition permit application the determination of economic feasibility and financial hardship of preserva-

tion. Because there remains an appropriate opportunity for Petitioner to present its evidence (even additional evidence, if it wishes) before the HDC regarding economic feasibility, we conclude that the designation procedures followed by Respondent did not deprive Petitioner unconstitutionally of its right to due process. There was no "bending" of the public hearing process as Petitioner alleges and, while conflation of the economic issues likely would have shortened the period of time before final resolution of the demolition permit application, Petitioner has failed to show sufficiently how the procedure followed amounted to a denial of due process.

### B. Petitioner's Additional Contentions That It Was Denied Procedural Due Process Are Not Properly Preserved For Appeal.

Petitioner posits an additional alternative contention that the City's withholding of the demolition permit, pending consideration for historic designation, denied the Trust's constitutionally protected rights to procedural due process guaranteed by Article 24 of the Maryland Declaration of Rights. Specifically, Petitioner argues that: (1) the City Code provides no safeguards in terms of how long a demolition permit application may be delayed pending review of historical/architectural significance of implicated structure; (2) the HDC review process provides no statutory guidance for timeliness for making a recommendation to the Mayor and Council; and (3) Section 25–123 of the City Code sets no time-frame for when the City Clerk must set a hearing before the Mayor and Council concerning the zoning map amendment application. Petitioner argues, in other words, that the lack of time limitations governing the review process creates a situation where City officials have unfettered discretion in reviewing the Property, which conceivably could delay indefinitely a final decision on the permit application.

An appellate court, under normal circumstances, will not render an opinion on a question posed in a case unless it appears clearly in the record that the issue framed in the question was raised in or decided by the trial court. Md. Rule

8–131(a). In the context of appellate review before this Court, furthermore, the Maryland Rules provide for additional limitations:

> Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition *and that has been preserved for review by the Court of Appeals.* Whenever an issue raised in a petition for certiorari or a cross-petitioner involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or cross-petition.

Maryland Rule 8–131(b) (emphasis added).

It is well-settled that the term "ordinarily" in Rule 8–131 implies that this Court has some discretion, although infrequently invoked, to address and decide questions notwithstanding a failure to raise the issues in the petition for writ of certiorari or in the proceedings below. *See, e.g., Purnell v. State,* 375 Md. 678, 686 n. 5, 827 A.2d 68, 73 n. 5 (2003); *Crown Oil & Wax Co. v. Glen,* 320 Md. 546, 561, 578 A.2d 1184, 1191 (1990); *Yarema v. Exxon Corp.,* 305 Md. 219, 231 n. 9, 503 A.2d 239, 245 n. 9 (1986); *Taub v. State,* 296 Md. 439, 441, 463 A.2d 819, 820 (1983). In that vein, an appellate court may render an opinion regarding a question not previously raised where the issue involves the trial court's subject matter jurisdiction over the action, the court's personal jurisdiction over the parties (unless waived) or when the issue is otherwise "necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Maryland Rule 8–131(a); *County Council of Prince George's County v. Offen,* 334 Md. 499, 508, 639 A.2d 1070, 1074 (1994) ("Ordinarily, an appellate court will consider only those issues that were raised or decided by the trial court, unless the issue concerns the jurisdiction of the court to hear the matter.") (citing Md. Rule

8–131(a)); *Moats v. City of Hagerstown,* 324 Md. 519, 524–25, 597 A.2d 972, 974–75 (1991); *Yarema,* 305 Md. at 231 n. 9, 503 A.2d at 245 n. 9; *Smith v. Taylor,* 285 Md. 143, 147, 400 A.2d 1130, 1133 (1979)). We decline to exercise our discretion to address Petitioner's arguments regarding the lack of statutory time limitations in the historic designation process.

This Court has held that "questions, including Constitutional issues, that could have been but were not presented to the administrative agency may not ordinarily be raised for the first time in any action for judicial review." *Bd. of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 208, 725 A.2d 1027, 1036–37 (1999); *see also Finucan v. Bd. of Physician Quality Assurance,* 151 Md.App. 399, 423, 827 A.2d 176, 190 (2003), *cert. granted,* 377 Md. 275, 833 A.2d 31 (2003), *aff'd,* 380 Md. 577, 846 A.2d 377 (2004), *cert. denied,* 543 U.S. 862, 125 S.Ct. 227, 160 L.Ed.2d 103 (2004), *reh'g denied,* 543 U.S. 1016, 125 S.Ct. 648, 160 L.Ed.2d 489 (2004). In the present litigation, there is no reason that the general rule should not apply with equal force to arguments not made before either the municipal zoning authority or the intervening reviewing courts.

The only instances Petitioner points to where it purportedly referred to procedural due process violations, prior to the petition for writ of certiorari, briefing, and oral argument before this Court, occurred in a 24 January 2002 letter to the Mayor and Council regarding the authorization of the HDC staff to file the zoning map amendment application. There, Petitioner argued that

> by withholding the demolition permit, requiring an HDC review of the historic significance of the Property and proceeding to consider the filing of a zoning map amendment to place the Property in the Historic District Zone, the City had created "... a presumption of historical value [of the Property] that has caused the property owner, whose property rights are in jeopardy, to bear the burden of proving that the site is not historic ... contrary to due process."

Aside from the fact that this particular issue regarding the allocation of burdens of proof was not raised again or decided before the circuit court or intermediate appellate court, the original due process argument relied upon does not involve the same subject matter as the alternative argument raised here concerning the lack of statutory time limitations. While the lack of time limitations may be related loosely to the issues of procedural due process, we find too attenuated the link between the absence of time limitations and the theory that the failure to consider economic feasibility is a violation of due process. *See Crown Oil & Wax Co.*, 320 Md. at 560–61, 578 A.2d at 1191 (determining that in some situations, a new argument may be presented on appeal when it does not present a new issue, but is instead an additional argument under the umbrella of an already preserved issue on appeal).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**